

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————————x
)
UNITED STATES OF AMERICA,                    )      **FILED UNDER SEAL**
)                        *6003*
Plaintiff,          )      Civil Action No. 03-~~60003~~
)
ROBERT PRITSKER,                              )      **FALSE CLAIMS ACT COMPLAINT**
)      **31 U.S.C. § 3729,** *et seq.*
RELATOR and       )
PLAINTIFF,        )      **JURY TRIAL DEMANDED**
)
vs.                             )
)
SODEXHO, INC., SODEXHO AMERICA, LLC,          )
SODEXHO MARRIOTT MANAGEMENT, INC.,            )
SODEXHO MANAGEMENT, INC., ARAMARK             )      **FILED**
CORPORATION, ARAMARK EDUCATIONAL              )
SERVICES, INC., and COMPASS GROUP USA,        )      AUG 1   2007
INC. (d/b/a CHARTWELLS),                      )
)      MICHAEL E. KUNZ, Clerk
DEFENDANTS.         )      By_____ Dep. Clerk
)
—————————————————————————x

### FIRST AMENDED COMPLAINT

Relator ROBERT PRITSKER ("Relator"), on behalf of himself and the United

States, brings this civil action under the False Claims Act, 31 U.S.C. § 3729, *et seq.* for

damages, penalties, and such other relief as the Court may order against Defendants

SODEXHO,    INC.,   SODEXHO    AMERICA,    LLC,    SODEXHO    MARRIOTT

MANAGEMENT,    INC.,    SODEXHO    MANAGEMENT,    INC.,    ARAMARK

CORPORATION, ARAMARK EDUCATIONAL SERVICES, INC., and COMPASS

GROUP USA, INC. (D/B/A CHARTWELLS) (collectively, "Defendants"), and alleges

upon information and belief as follows:

## NATURE OF ACTION

1.     This action seeks tens of millions of dollars in damages to the Federally-funded National Student Lunch Program ("NSLP") and School Breakfast Program ("SBP") by Defendants as a result of false and fraudulent claims submitted to the United States for payment in violation of the False Claims Act (the "FCA" or the "Act"), 31 U.S.C. § 3729 *et seq.* Defendants are Food Service Management Companies ("FSMCs") that manage and operate food services for hundreds of school food authorities ("SFAs") nationwide participating in the NSLP and SBP entitlement grant programs.

2.     The NSLP and SBP are multi-billion dollar Federally-funded entitlement grant programs that provide assistance to States in the form of cash and commodities donated by the United States Department of Agriculture ("USDA") to benefit non-profit food services in K-12 schools.  As set forth more fully herein, for more than a decade, Defendants have siphoned off millions of dollars in surreptitious profits to the detriment of the Federal NSLP and SBP programs and taxpayers (i) by failing to credit SFAs, with whom Defendants have entered into cost-reimbursable contracts, with rebates, discounts and allowances Defendants received from food manufacturers and national distributors; and (ii) caused additional damaged to those Federally-funded programs by funneling their purchases of food and supplies through national distributors that enabled the Defendants to enjoy such rebates rather than seeking competitive prices from local distributors who offered lower prices on like goods purchased by Defendants acting on behalf of the SFAs but did not offer Defendants the opportunity to enjoy any of those rebates.

3.     As a result of this scheme, Defendants have caused SFAs and state agencies (SAs) that obtain NSLP and SBP entitlement grant money for qualified meals served by

2

SFAs to make false certifications of compliance with regulations applicable to the NSLP and SBP that prohibit grantees (i) from incurring costs that are not net of all available rebates, discounts, and allowances, and (ii) from conducting procurement transactions in a manner that does not provide full and open competition.

4.     In this suit, Relator, on behalf of himself and the United States, seeks all the remedies available under the FCA, 31 U.S.C. § 3729, *et seq*. These include civil penalties of up to $11,000 and a minimum of $5,000 per false claim against each Defendant and three times the amount of damages that the United States has sustained because of these false claims, as well as reasonable attorneys' fees and costs associated with prosecuting this action.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b)(1), and 28 U.S.C. §§ 1331 and 1345.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), which provides that any action brought under 31 U.S.C. § 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by 31 U.S.C. § 3729 occurred.

7.     This action is not based upon any public disclosure of information within the meaning of 31 U.S.C. § 3730(e)(4)(A). To the extent any of these allegations may have been publicly disclosed within the meaning of 31 U.S.C. § 3730(e)(4)(A), Relator has direct and independent knowledge of the information on which the allegations are based

within the meaning of 31 U.S.C. § 3730(e)(4)(B) and voluntarily provided the information to the Government before this action was filed.

8.      As required by 31 U.S.C. § 3730(b)(2), the Relator provided to the United States Attorney General and to the United States Attorney for the Eastern District of Pennsylvania a Statement of Disclosure containing material evidence and known information in support of this Complaint.

## PARTIES

9.      Relator Robert Pritsker is a resident of the State of Connecticut, and is an individual over the age of twenty-one (21). Mr. Pritsker resides in Weston, Connecticut and his children attend school in the Weston School District. Defendant Sodexho, Inc. ("Sodexho") was the FSMC for the Weston School District from at least 1998 until 2004.

10.     Defendant Sodexho is an FSMC that has entered into cost reimbursable food service management contracts with SFAs throughout the country participating in the NSLP and SBP entitlement grant programs.    Defendant Sodexho is headquartered in Gaithersburg, Maryland, and is a wholly-owned subsidiary of Sodexho Alliance, SA, a leading global provider of food and facilities management headquartered in Paris, France. Sodexho is a leading foodservice operator in North America serving corporations, health care, long term care and retirement centers, schools, college campuses, and the government. For its fiscal year ended August 31, 2006, Sodexho, Inc. had revenues of approximately $6.7 billion. As alleged herein, in violation of 31 U.S.C. § 3729, *et seq.*, Defendant Sodexho, doing business through its subsidiaries Sodexho America, LLC, Sodexho Marriott Management, Inc. and Sodexho Management Inc., also headquartered in Gaithersburg, Maryland, (i) knowingly caused false claims to be presented for payment or

4

approval to the United States under the NSLP and SBP entitlement grant programs, and (ii) knowingly caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

11. Defendant Aramark Corporation ("Aramark") is a Delaware corporation headquartered in Philadelphia, Pennsylvania, within this district. Defendant Aramark is an FSMC that has entered into cost reimbursable food service management contracts with SFAs throughout the country participating in the NSLP and SBP entitlement grant programs. Aramark is one of the largest food, hospitality and facilities management companies in the United States. For its fiscal year ended September 29, 2006, Aramark reported sales in excess of $11 billion and net income of more than $260 million. On January 26, 2007, Defendant Aramark announced the completion of a merger in which Aramark was acquired by an investor group led by Joseph Neubauer, Aramark's chairman and chief executive officer, and investment funds managed by GS Capital Partners, CCMP Capital Advisors and J.P. Morgan Partners, Thomas H. Lee Partners and Warburg Pincus LLC. As alleged herein, in violation of 31 U.S.C. § 3729, *et seq.*, Defendant Aramark, doing business through its subsidiary Aramark Educational Services, Inc. also headquartered in Delaware, (i) knowingly caused false claims to be presented for payment or approval to the United States under the NSLP and SBP entitlement grant programs, and (ii) knowingly caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

12. Defendant Compass Group USA, Inc., d/b/a Chartwells ("Chartwells"), is a division of Compass Group, a British company trading on the London Stock Exchange. Chartwells, which is headquartered in Charlotte, North Carolina, provides managed

5

foodservices to corporate clients, educational and healthcare facilities and entertainment venues. Defendant Chartwells is an FSMC that has entered into cost reimbursable food service management contracts with SFAs throughout the country participating in the NSLP and SBP entitlement grant programs. For its fiscal year ended September 30, 2006, Chartwells had revenues of approximately $8.58 billion. As alleged herein, in violation of 31 U.S.C. § 3729, *et seq.*, Defendant Chartwells (i) knowingly caused false claims to be presented for payment or approval to the United States under the NSLP and SBP entitlement grant programs, and (ii) knowingly caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

13.     Defendants Sodexho, Inc., Sodexho America, LLC, Sodexho Marriott Management, Inc., Sodexho Management, Inc., Aramark Corporation, Aramark Educational Services, Inc., and Compass Group USA, Inc. (d/b/a Chartwells) are referred to collectively as "Defendants." Defendants managed food service operations for more than 700 SFAs during the 1999-2000 school year. By the 2005-2006 school year, this number had more than doubled.

## SUBSTANTIVE ALLEGATIONS

## I.     THE NSLP, THE SBP AND APPLICABLE FEDERAL REGULATIONS

14.     On June 4, 1946, Congress passed the National School Lunch Act, 42 U.S.C. § 1751, which authorized and established the NSLP. The National Student Lunch Act states in pertinent part that:

> It is declared to be the policy of Congress, as a measure of national security, to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States, through grants-in-aid and other means, in providing an adequate supply of foods and other facilities for the

6

establishment, maintenance, operation, and expansion of nonprofit school lunch programs.

*Id.* at 42 U.S.C. §1751.

15.     On October 11, 1966, Congress established a pilot project to assist schools serving breakfast to nutritionally needy children.  On October 7, 1975, Congress made the project final and passed the School Breakfast Program, 42 U.S.C. § 1773, which authorized and established the SBP.

16.     The NSLP and SBP provide Federal assistance in cash and commodities donated by the United States Department of Agriculture ("USDA") to the States in order to benefit K-12 schools' non-profit food services.  For the 2004-2005 school year, the USDA's Food and Nutrition Service ("FNS"), which administers the NSLP and SBP, disbursed approximately $10 billion in connection with these programs.

17.     NSLP and SBP entitlement grant money is paid to grantee state agencies (SAs), usually state education agencies, which are responsible for administering the NSLP and SBP statewide and for distributing NSLP and SBP entitlement grant money to SFA sub-grantees based on Claims for Reimbursement prepared by SFAs (or by an FSMC on an SFA's behalf) indicating the number of program meals served.  The FNS enters into written agreements with SAs pursuant to which the SAs agree to comply with the NSLP, the SBP and applicable program regulations found at 7 C.F.R. §§ 210, 220, 3015 and 3016.  Form FNS-74 – Federal State Agreement Child Nutrition and Food Distribution Programs Food and Nutrition Service U.S. Department of Agriculture states in pertinent part:

> 9.  What are the requirements for FNS?
>
> Subject to available appropriations, FNS will provide funds and commodities to the State Agency for the programs covered by this agreement . . . .  FNS will provide the funds and commodities in

7

accordance with program statutes, program regulations, and FNS instructions, policy memoranda, guidance, and other written directives interpreting the program statutes and program regulations, and the other statutes and regulations cited in this agreement.

10. What are the requirements for the State agency?

Program Statutes, Program Regulations, Instructions, Policy Memoranda, and Guidance

The State agency will comply with the program statutes and program regulations applicable to the programs covered by this agreement. The State agency also will comply with any FNS instructions, policy memoranda, guidance, and other written directives interpreting the program statutes and program regulations applicable to those programs.

Departmental Regulations on Grants and Cooperative Agreements

The State Agency will comply with the following USDA Regulations:

7 CFR Part 3015, Uniform Federal Assistance Regulations

7 CFR Part 3016, Uniform Administrative Requirements for Grants and Cooperative Agreements . . . .

18.     Each SFA participating in the NSLP and SBP must enter into a written agreement ("Agreement") with the relevant SA containing the same representations set forth in the FNS-SA Agreement.  7 C.F.R. §§ 210.9(b), 220.7.  Pursuant to Federal regulations [7 C.F.R. §§ 210.7(a), 220.10], reimbursement payments under the NSLP and SBP may be made only to SFAs operating under a written Agreement with a SA.  Federal regulations permit SFAs to contract with FSMCs to manage nonprofit school foodservice operations in K-12 schools.  7 C.F.R. §§ 210.16, 220.7(d).

19.     Pursuant to Federal regulations [7 C.F.R. §§ 210.5(a), 220.16(a)], recipients of federal NSLP and SBP entitlement grant money (*i.e.*, SAs and SFAs) must comply with 7 C.F.R. § 3016 (and prior to July 1, 2001, 7 C.F.R. § 3015), which restricts the use of

8

Federal entitlement grant money. Specifically, "[g]rant funds may be used only for: (1) The allowable costs of the grantees [or] subgrantees . . . ; and (2) Reasonable fees or profit to cost-type contractors but not any fee or profit (or other increment above allowable costs) to the grantee or subgrantee." 7 C.F.R. § 3016.22(a). Because Federal NSLP and SBP entitlement grant funds are delivered to and administered through SAs, 7 C.F.R. § 3016.22(b) directs that the allowable cost provisions of OMB Circular A-87 ("A-87") apply. OMB A-87 states in relevant part:

> Materials and supplies costs:
>
> a. Costs incurred for materials, supplies and fabricated parts necessary to carry out a Federal award are allowable.
>
> b. *Purchased materials and supplies shall be charged at their actual prices, net of applicable credits*. Withdrawals from general stores or stockrooms should be charged at cost under any recognized method of pricing inventory withdrawals, consistently applied. Incoming transportation charges are a proper part of materials and supplies costs.

*Id.* at OMB Circular A–87 (May 10, 2004), Attachment B at ¶ 26. The Circular defines "applicable credits" as:

> [R]eceipts or reductions of expenditure-type transactions that offset or reduce expense items allocable to Federal awards as direct or indirect costs. Examples of such transactions are:   purchase discounts, rebates or allowances, recoveries or indemnities on losses, insurance refunds or rebates, and adjustments of overpayments or erroneous charges.

20.     Further, 7 C.F.R. § 3016.36(c) provides that "[a]ll procurement transactions will be conducted in a manner providing full and open competition." "[S]ituations considered to be restrictive of competition include, [among other things,] ... (iii) Noncompetitive pricing practices between firms or between affiliated companies, . . . [and] (vii) . . . arbitrary action in the procurement process." Pursuant to 7 C.F.R 3016(d)(1)-(3), methods of procurement to be followed are limited to (i) procurement by small purchase

procedures (to be used with respect to purchases costing less than $100,000) after obtaining price or rate quotes from an adequate number of qualified sources; (ii) procurement by scaled bid; and (iii) procurement by competitive proposals.   Procurement by noncompetitive proposals (*i.e.*, through solicitation of a proposal from only one source) may be used only when the award of a contract is infeasible under small purchase procedures, sealed bids or competitive proposals and one of the following applies: (A) The item is available only from a single source: (B) The public exigency or emergency for the requirement will not permit a delay resulting from competitive solicitation; (C) The awarding agency authorizes noncompetitive proposals; or (D) After solicitation of a nnmber of sources, competition is determined inadequate."  7 C.F.R. § 3016(d)(4)(i).

21.     Federal regulations [7 C.F.R. § 210.16(a)(1)] mandate that any SFA that employs an FSMC with respect to its food service operations must "[a]dhere to the procurement standards specified in 7 C.F.R. § 210.21," which requires SAs and SFAs to comply with the requirements of 7 C.F.R. § 3016 "concerning the procurement of supplies, food, equipment and other services with [NSLP and SBP] funds."  *See also* 7 C.F.R. §220.13(i).

22.     Pursuant to Federal regulations, in order to receive Federal reimbursement dollars from the grantee SAs, "each school food authority shall submit to the State agency, a monthly Claim for Reimbursement, as described in paragraph (c) of this section."  7 C.F.R. § 210.8(b); *see also* 7 C.F.R. § 220.11(a).  "The Claim for Reimbursement shall include data in sufficient detail to justify the reimbursement claimed and to enable the State agency to provide the Report of School Program Operations required under § 210.5(d) of this part." 7 C.F.R. §§ 210.8(c), 220.11(b).  Schools that participate in both the NSLP and

10

the SBP may submit one claim for reimbursement to cover both programs.  7 C.F.R. § 220.11(c).  Claims for Reimbursement "shall be signed by the school food authority official."  7 C.F.R. § 210.8(c).  The signatory on the form certifies that the claim is in accordance with applicable regulations or the terms of the existing Agreement between the SFA and SA, which mandate compliance with, *inter alia*, 7 C.F.R. §§ 210, 220, 3015, and 3016.  Prior to 2001, SFAs filed hard copies of their Claims for Reimbursement.  Since then, however, Claims for Reimbursement are filed online and a box containing the certification must be checked in order for the claim to be submitted.

23.     SAs file monthly and annual reports (on form FNS-10) and total the Claims for Reimbursement received from SFAs in their respective States in support of their requests for NSLP and SBP entitlement grant money.  7 C.F.R. §§ 210.5(d), 220.13(b)(1).  In addition, SAs file quarterly reports on Form SF-269 certifying "that all outlays and unliquidated obligations are for the purposes set forth in the award documents."  7 C.F.R. §§ 210.19, 220.13(b)(2).  Federal entitlement grant money received by SFAs must be deposited into the nonprofit school foodservice account.  SFAs, in turn, use these funds to pay cost reimbursement plus management fee invoices received from Defendants.

24.     Federal regulations [7 C.F.R. § 210.16(c)] also prohibit "cost-plus-a-percentage-of-cost"                                                                                      contracts.

11

## II.   DEFENDANTS KNOWINGLY CAUSED FALSE CLAIMS TO BE MADE IN VIOLATION OF THE FCA

### A.   Defendants' Retention of Rebates

25.     During the relevant period, Defendants contracted with hundreds of SFAs nationwide to manage foodservice operations on a cost-reimbursable contract basis. Pursuant to these cost-reimbursable contracts, Defendants billed SFAs for the costs incurred by Defendants in managing and operating foodservices for the SFAs including (i) costs of food, beverages and supplies purchased by Defendants on behalf of the SFAs; (ii) salaries and wages of Defendants' employees involved in operating the foodservice; and (iii) other costs incurred by Defendants that were necessary to discharge their obligations under the contracts. In addition, these cost-reimbursable contracts allowed Defendants to charge specified "management" and "administration" fees usually expressed as pennies per meal. These amounts were paid to Defendants by the SFAs using NSLP and SBP entitlement grant money that SFAs and SAs obtained by certifying compliance with applicable NSLP and SBP regulations and Federal regulations set forth above. Defendants' evidenced their awareness of the regulations governing the SAs and SFAs in their contracts, which contained provisions stating that Defendants would fully comply with all applicable laws, rules and regulations including those enumerated above governing payments to grantees and sub-grantees pursuant to the NSLP and SBP.

26.     In fact, although Federal regulations required SFAs' purchases to be net of all rebates, discounts and allowances and Requests for Proposal ("RFPs") issued by SFAs and received and reviewed by Defendants made this clear, Defendants later excluded this language from their contracts and instead inserted provisions permitting Defendants to

retain rebates, discounts and allowances received from national distributors and food manufacturers. Alternatively, although certain of Defendants' contracts stated that rebates would be passed through to the SFAs as required by the NSLP, the SBP and applicable Federal regulations or were silent as to this specific issue, in fact, Defendants retained these rebates.

27.    As large volume buyers in the food industry, Defendants obtained significant rebates, discounts and allowances from national food manufacturers and distributors which reduced the cost to Defendants of the goods they purchased on behalf of SFAs. These rebates came in two forms: (i) a "rigged" spread negotiated between Defendants and food manufacturers that resulted in a higher "into distribution price" for the food being purchased for SFAs contracting with Defendants, which was then "billed back" to the manufacturers by Defendants and returned by the manufacturers to Defendants in the form of a rebate; and (ii) a rebate off the distributors' mark-up of the "into distribution price" offered by national distributors such as Sysco for such things as drop size, prompt payment, Web-based ordering and buying goods branded with the distributors' name. While these "rebates" resulted in substantial profits for Defendants, they significantly and artificially increased the cost of food and supplies purchased for the SFAs, which was paid with Federal NSLP and SBP entitlement grant funds. Prices paid by SFAs with NSLP and SBP funds were further increased by the mark-up of the higher "into distribution price" by the national distributors with whom Defendants contracted.

28.    The rebates retained by Defendants and Defendants' purchases of food and supplies on behalf of SFAs through national distributors substantially increased

13

Defendants' remuneration under their contracts with SFAs far beyond the management and administrative fees of pennies per meal stated in the contracts.

29.     In addition, Defendants' rebate retention scheme effectively transformed Defendants' cost-reimbursable contracts into prohibited "cost-plus-a-percentage-of-cost" contracts. Were an FSMC with a net cost of $8 to seek reimbursement of $10 for the same item from an SFA, that $2 markup defines the prohibited cost-plus-a-percentage-of-cost contract. An FSMC's paying a distributor $10, billing the SFA $10, only to billback the manufacturer for the $2 rebate results in the exact same prohibited cost-plus-a-percentage-of-cost contract. The $2 is a percentage of the net cost of $8.

30.     In view of the foregoing, the certifications of compliance with NSLP and SBP rules and applicable Federal regulations by SAs and SFAs in order to access NSLP and SBP entitlement grant funds, which were a condition of participation and payment in the programs, were false.

## 1.     **SODEXHO**

31.     Hundreds of cost-reimbursable contracts between Sodexho and SFAs during the relevant period expressly provided that Sodexho would retain rebates, discounts and allowances from food manufacturers and national distributors in whole or in part. For example, many of Sodexho's contracts with SFAs including, but not limited to, those set forth below, contained substantially identical provisions with respect to rebates, discounts and allowances stating: "Operating expenses shall be the net of any rebates obtained from local vendors, suppliers, or distributors for goods procured solely for Client's account. *Prompt payment discounts and any other rebates or allowances obtained from vendors, suppliers, or distributors including those obtained through regional or national*

14

*purchasing arrangements, will be retained by [Sodexho]. In any event, however, the invoiced amounts of such goods shall be competitive, on an aggregate basis, with prices at which such goods and services can be purchased in the geographic area of the Food Service operations, whether those goods are distributed through an unaffiliated distributor.*"

32.  Sodexho contracts containing language substantially similar to the foregoing include, but are not limited to:

(a)  Management Agreement dated August 1, 2001, between Sodexho America, LLC and the Orange County Public School District in Orange, Virginia. This contract was later extended through June 2005 by an amendment dated August 18, 2004, between the Orange County Public School District and Sodexho Management, Inc.

(b)  Management Agreement effective July 1, 2005, between Sodexho Marriott Management, Inc. and the Rutland, Vermont Public Schools. This contract was later amended by an addendum dated August 18, 2005, between Rutland Vermont Public Schools and Sodexho Management, Inc, which contains the foregoing language.

(c)  Management Agreement dated May 2, 2001, between Sodexho America, LLC and the Edina Independent School District #273 in the city of Edina, Minnesota. This contract was later extended through June 2003 by agreement effective July 1, 2002, between Sodexho America, LLC and Edina Independent School District #273.

(d)  Management Agreement effective July 1, 2000, between Sodexho America, LLC and the Faribault Independent School District # 656 for the city of Faribault, Minnesota. This contract was later extended through June 2005 by agreement dated April

15

14, 2004, between Sodexho America, LLC and Faribault Independent School District # 656.

33.     Sodexho knew, or recklessly disregarded, that its retention of rebates, discounts and allowances caused false claims to be submitted to the United States. The cost-reimbursable contracts in question were awarded to Sodexho based upon its responses to Requests for Proposal ("RFPs") issued by SFAs, which made clear that SFAs were to receive all rebates and discounts, and mandated FSMC proposal and contract compliance with all applicable NSLP and SBP rules and Federal regulations. For example:

(a)     The Orange County Public Schools RFP, for Orange, Virginia issued June 25, 2001, provided that: (i) "The FSMC shall conduct all food service program operations in accordance with 7 CFR Parts 210, 215, 220, 245, 250." [Standard Terms and Conditions, Article I.D]; (ii) "The FSMC shall comply with the rules and regulations of the VA DOE and the USDA, and any additions or amendments thereto, including but not limited to 7 CFR Parts 210, 215, 220, 245, and 250 and Title 7 CFR Part 225 (SFSP), if applicable...." [Standard Terms and Conditions, Article I.M]; and (iii) "OCPS shall receive any and all discounts or rebates for purchases made on their behalf." [Standard Terms and Conditions, Article XII.B];

(b)     The Rutland Public School District of Rutland, Vermont, published an RFP in the Spring of 2005, which provided: (i) "The FSMC shall comply with the rules and regulations of the Commissioner of Education, State of Vermont, and the United States Department of Agriculture and any conditions or amendments thereto." [Section II, Scope and Purpose, 2(F)]; (ii) "The FSMC shall purchase all food and non-food commodities at the lowest price possible, consistent with maintaining quality standards." [Section II,

16

Specifications, 12(A)]; and (iii) "Any proposals submitted shall be in accordance with the laws of the State of Vermont, regulations and standards of the Vermont Department of Education, and shall conform to the standards of the United States Department of Agriculture." [Section II, Specifications, 22];

      (c)    The Edina School District #273 for the city of Edina, Minnesota issued an RFP in the spring of 2001 for the 2001-2002 school year which provided: (i) "The Contractor shall purchase all food and supply items required by the food service program except to the extent those items are available through the USDA Commodity Program. Such purchases shall comply with all applicable regulations of the USDA and the DESE and shall include the use of competitive bidding, when applicable." [General Information, Article V, ¶T];

      (d)    The Faribault Independent School District #656 for the city of Faribault, Minnesota issued an RFP in the spring of 2000 for the 2000-2001 school year which provided: (i) "The Operator shall comply with all laws and regulations applicable to its food services operations hereunder." (RFP at 8); and (ii) "For the purpose of this Agreement, the Actual Food Service Operating cost shall consist of the following: (1) The actual cost of all food, beverages and supplies purchased by the Operator for food services operation on the premises, excluding donated commodities, but including processed commodity charges, applicable taxes and delivery charges, less all applicable discounts and rebates." (RFP at 10).

    34.    Upon information and belief, Sodexho invoiced SFAs for costs consistent with the terms of the aforementioned cost reimbursement contracts and other cost-reimbursable contracts without crediting the SFAs for the rebates, discounts and

17

allowances it had obtained from food manufacturers and national distributors (no such rebates were reflected on Sodexho's invoices to SFAs).  Upon information and belief, Sodexho invoices paid by SFAs with NSLP and SBP entitlement grant funds that reflected costs that were not net of rebates, discounts and allowances as required by applicable NSLP and SBP rules and Federal regulations include, but are not limited to, the following:

        (a)    Orange County, Virginia School District:

            i.    Sodexho Invoice # 1000082817 dated October 9, 2004, in the amount of $84,865.17 paid by check # 0059343.

            ii.    Sodexho Invoice # 1000082691 dated November 6, 2004, in the amount of $82, 295.11 paid by check # 0059343.

        (b)    Rutland, Vermont City Public Schools:

            i.    Sodexho Invoice # 1000131197 dated October 11, 2005, in the amount of $159,525.28 paid by check # 83665.

        (c)    Edina, Minnesota School District #273:

            i.    Sodexho Invoice # 283925 dated October 15, 2001, in the amount of $244,505.18 paid by check # 223255.

            ii.    Sodexho Invoice # 285774 dated November 12, 2001, in the amount of $254,115.87 paid by check # 223982.

        (d)    Faribault, Minnesota School District:

            i.    Sodexho Invoice # 1000087115 dated December 4, 2004, in the amount of $26,763.81 paid by check # 54610.

            ii.    Sodexho Invoice # 326824 dated November 30, 2004, in the amount of $60,973.00 paid by check # 54283.

iii.     Sodexho Invoice # 326823 dated November 12, 2004,

and Invoice # 1000084881 dated November 8, 2004, in the amounts of $73,868.00

and $46,470.00, respectively, paid by check # 54000 in the amount of $120,338.00.

iv.     Sodexho Invoice # 326822 dated November 3, 2004,

in the amount of $77,519.00 paid by check # 53751.

v.     Sodexho Invoice # 326821 dated October 15, 2004, in

the amount of $67,765.00 paid by check # 53271.

35.     By invoicing SFAs and receiving payment from NSLP and SBP entitlement

grant funds for costs that were not net of rebates, discounts, and allowances received from

food manufacturers and national distributors, Sodexho caused false certifications of

compliance with applicable NSLP and SBP rules and Federal regulations and the

Agreements between SFAs and SAs that were presented to the United States in connection

with accessing NSLP and SBP entitlement grant funds. Upon information and belief, SFAs

contracting with Sodexho including, but not limited to, those set forth above, obtained

NSLP and SBP entitlement grant funds by filing Claims for Reimbursement falsely

certifying compliance with applicable NSLP and SBP program regulations and Federal

regulations and the terms of the Agreements when, in fact, the costs Sodexho was charging

the SFAs were neither net of rebates (and thus were effectively equivalent to the prohibited

cost-plus-a-percentage-of-cost contract) nor, as set forth more fully below, procured in a

manner providing full and open competition as required. Claims for Reimbursement

including such false certifications caused by Sodexho include, but are not limited to, the

following:

(a)     Orange County School District for Orange, Virginia:

19

           i.       Virginia Department of Education Claim for Reimbursement dated September 2003 in the amount of $44,057.30;

           ii.      Virginia Department of Education Claim for Reimbursement dated October 2003 in the amount of $63,074.24;

           iii.     Virginia Department of Education Claim for Reimbursement dated November 2003 in the amount of $45,689.78;

           iv.     Virginia Department of Education Claim for Reimbursement dated December 2003 in the amount of 35,952.20;

           v.      Virginia Department of Education Claim for Reimbursement dated January 2004 in the amount of $39,618.60;

           vi.     Virginia Department of Education Claim for Reimbursement dated February 2004 in the amount of $46,022.70;

           vii.    Virginia Department of Education Claim for Reimbursement dated March 2004 in the amount of $64,288.92;

           viii.   Virginia Department of Education Claim for Reimbursement dated April 2004 in the amount of $56,333.23;

           ix.     Virginia Department of Education Claim for Reimbursement dated May 2004 in the amount of $56,843.28;

           xi.     Virginia Department of Education Claim for Reimbursement dated June 2004 in the amount of $21,129.57;

        (b)     Rutland Public School District of Rutland, Vermont:

           i.       NSLP and SBP Claim for Reimbursement dated September 2005 in the amount of $56,507.63;

      ii.  NSLP and SBP Claim for Reimbursement dated

October 2005 in the amount of $50,036.82.

     (c)  Independent School District No. 273 for Edina, Minnesota:

      i.  NSLP Claim for Reimbursement dated September

2001 in the amount of $2701.76;

      ii.  NSLP Claim for Reimbursement dated October 2001

in the amount of $2923.20;

      iii.  NSLP Claim for Reimbursement dated November

2001 in the amount of $2,609.44;

      iv.  NSLP Claim for Reimbursement dated December

2001 in the amount of $2,239.84 ;

      v.  NSLP Claim for Reimbursement dated January 2002

in the amount of $2,664.64;

      vi.  NSLP Claim for Reimbursement dated February 2002

in the amount of $2,614.56;

      vii.  NSLP Claim for Reimbursement dated March 2002 in

the amount of $2,749.76;

      viii.  NSLP Claim for Reimbursement dated April 2002 in

the amount of $2,487.68;

      ix.  NSLP Claim for Reimbursement dated May 2002 in

the amount of 3,191.84;

      x.  NSLP Claim for Reimbursement dated June 2002 in

the amount of $615.60.

(d)     Independent School District No. 656 for Faribault, Minnesota:

i.     NSLP and SBP Claim for Reimbursement dated

September 2004 in the amount of $86,091.71;

ii.     NSLP and SBP Claim for Reimbursement dated

October 2004 in the amount of $75,182.00;

36.     In addition to the scheme of the Sodexho contracts stated above, some of the contracts contained language that originally provided the SFAs would be credited with rebates, discounts, and allowances from food manufacturers and national distributors in whole or in part. However, in the example of Pine Richland SFA, this language was subsequently changed by amendment to allow Sodexho to retain the rebates, discounts, and allowances from food manufacturers and national distributors contradicting the original intentions of the SFAs in accepting Sodexho's bid.    For example, the Management Agreement between Pine Richland School District and Sodexho, Inc. provided that, "The SFA shall receive any discounts or rebates for purchases made on their behalf. The FSMC shall purchase all food and non-food commodities at the lower price possible consistent with maintaining quality standards."    [Management Agreement, Article XII.B].    This contract was later amended in an Amendment dated June 29, 2004, which provided in relevant part that "operating expenses shall be net of any rebates obtained from local vendors, suppliers, or distributors for goods procured solely for the SFA's account. *Prompt payment discounts and any other rebates or allowances obtained from vendors, suppliers, or distributors, including those obtained through the FSMC's regional or national purchasing or distribution arrangements, will be retained by the FSMC.*" [Amendment at 2].

22

37.     Upon information and belief, Sodexho invoiced SFAs for costs consistent with the cost reimbursement contracts without crediting the SFAs for the rebates, discounts, and allowances it had obtained from food manufacturers and national distributors. Sodexho invoices paid by SFAs with NSLP and SBP entitlement grant funds that reflected costs that were not net of rebates, discounts and allowances as required by applicable NSLP and SBP rules and Federal regulations. For example, Pine Richland School District paid the following invoices:

(a)     Sodexho Invoice # 1000094969 dated February 8, 2005, in the amount of $116,274.40 paid by check # 8041.

(b)     Sodexho Invoice # 1000102970 dated March 8, 2005, in the amount of $120,547.10 paid by check # 8045.

(c)     Sodexho Invoice # 1000108411 dated April 9, 2005, in the amount of $118,502.22 paid by check # 8051.

(d)     Sodexho Invoice # 1000109793 dated May 7, 2005, in the amount of $128,577.11 paid by check # 8055.

(e)     Sodexho Invoice # 1000109152 dated June 7, 2005, in the amount of $107,573.09 paid by check #8061.

(f)     Sodexho Invoice # 1000124488 dated July 9, 2005 in the amount of $16,386.41 paid by check #8067.

39.     By invoicing SFAs and receiving payment from NSLP and SBP entitlement grant funds for costs that were not net of rebates received from food manufacturers and national distributors, Sodexho caused false certifications of compliance with applicable NSLP and SBP rules and Federal regulations and the Agreements between SFAs and SAs

23

to be presented to the United States in connection with accessing NSLP and SBP entitlement grant funds. Sodexho's SFA customers obtained NSLP and SBP entitlement grant funds by filing Claims for Reimbursement falsely certifying compliance with applicable NSLP and SBP program regulations and Federal regulations when in fact, the costs Sodexho was charging the SFAs were neither net of rebates nor procured in a manner providing full and open competition as required. For example, Pine Richland School District presented the following Claims for Reimbursement:

(a)     NSLP and SBP Claims for Reimbursement dated August 2004 in the amount of $3,708.16;

(b)     NSLP and SBP Claims for Reimbursement dated September 2004 in the amount of $17,813.82;

(c)     NSLP and SBP Claims for Reimbursement dated October 2004 in the amount of $18,809.99;

(d)     NSLP and SBP Claims for Reimbursement dated November 2004 in the amount of $15,219.33;

(e)     NSLP and SBP Claims for Reimbursement dated December 2004 in the amount of $15,400.69;

(f)     NSLP and SBP Claims for Reimbursement dated January 2005 in the amount of $17,079.76;

(g)     NSLP and SBP Claims for Reimbursement dated February 2005 in the amount of $16,990.43;

(h)     NSLP and SBP Claims for Reimbursement dated March 2005 in the amount of $16,187.62;

24

(i)     NSLP and SBP Claims for Reimbursement dated April 2005 in the amount of $19,254.11;

(j)     NSLP and SBP Claims for Reimbursement dated May 2005 in the amount of $18,118.10.

40.     Although most of Sodexho's contracts with SFAs contained language substantially similar to that set forth above stating that Sodexho would retain rebates, in certain instances, Sodexho's contracts with SFAs represented that rebates, discounts and allowances would be returned to SFAs. For example,

(a)     Sodexho's July 1, 2001, contract with the Sierra Vista, Arizona Public Schools Unified District No. 68, with the option of four additional terms of one school year each by mutual agreement, stated in relevant part that: (i) "Sodexho agrees that it will perform the work described in this agreement in full compliance with all applicable laws, rules, and regulations adopted or promulgated by any federal or state regulatory body or governmental agency" [Article 2.2(B)]; (ii) "Sodexho agrees to meet all requirements and performance standards that may be specified by rule or regulation by any administrative officials or bodies charged with enforcement of any state or federal laws on the subject matter of this agreement" [Article 2.2(C)]; and (iii) "All refunds/rebates for all food/non food items shall be property of the District and deposited as a separate deposit from sales into the food service bank account" [Article 6.1(B)(2)]. Nevertheless, upon information and belief, in violation of the contract, Sodexho has failed to credit Sierra Vista with any rebates it has received from national manufacturers, vendors, and distributors. No such rebates were reflected on invoices sent by Sodexho to Sierra Vista. According to an administrative secretary at Sierra Vista knowledgeable about Sodexho's agreement with the

25

school district, Sierra Vista has not seen a credit for a rebate in the fifteen years that Sodexho has been the FSMC for the district.

        (b)    Sodexho's Management Agreement dated July 1, 1998, with the Belton School District #124 in the city of Belton, Missouri, which was later extended through June 2003 by amendment dated September 21, 2002. Although the Management Agreement originally contained the language set forth above in par. 31 stating that Sodexho would retain rebates, the Amendment changed this language to state as follows: "The invoice amounts to Sodexho of goods, including food, beverages, merchandise, supplies, plus a Charge for procurement services equal to $065 per Pattern Meal and Meal Equivalent. Rebates or allowances obtained from vendors, suppliers, or distributors, including those obtained through Sodexho's regional or national purchasing or distribution agreements as a direct result of purchases made on behalf of District, will be credited to the Food Service Account." [Amendment dated September 21, 2002 at 1.] Nevertheless, upon information and belief, in violation of the contract, Sodexho has failed to credit Belton School District with any rebates it has received from national manufacturers, vendors, and distributors. No such rebates were reflected on invoices sent by Sodexho to Belton.

        41.    Sodexho knew, or recklessly disregarded, that its failure to credit Sierra Vista and Belton with rebates Sodexho received from national manufacturers, distributors and suppliers caused the SFAs to falsely certify compliance with applicable NSLP rules and Federal regulations in accessing Federal funds. For example:

        (a)    The RFP for the Sierra Vista Public Schools Unified District ("SVPSUD"), in Sierra Vista, Arizona, dated March 12, 2001, informs bidders that:

> **The Code of Federal Regulations (CFR) provides rules that SVPSUD must observe if they are to participate in the NSLP, the SBP, the SMP,**

> *and other meal programs.  All contracts should require that FSMC
> conduct program operations in accordance with 7 CFR Parts 210, 215,
> 220, 245, 250 and FCS instructions and policies as applicable.*
> Incorporation of program regulations provides a common basis for
> performance by the FSMC.

Section VIII.M. (emphasis added).  Additionally, the RFP further states:

> Reporting, 210.16 (c)(1) — The FSMC must report the claim information
> to SVPSUD promptly at the end of each month or more frequently as
> specified by SVPSUD.  All credits received by the FSMC must be credited
> back to the district.  The FSMC shall assume liability for any negligence for
> claims assessed as a result of federal/state review/audits corresponding with
> SVPSUD period of liability.  *All refunds and/or credits received for
> food/non food items must be noted on the monthly invoices and district
> administration must be informed.*

Section VIII.F. (emphasis added).

   (b) The Belton School District #124 for the city of Belton, Missouri

issued an RFP on April 14, 1998 for the 1998-1999 school year which informed bidders: (i)

"[The Management FSMC] shall agree to strictly observe all applicable State and Federal

statutes, rules, regulations which now exist or which may be promulgated during the term

of this agreement of [sic] extension thereof, i.e. Current Federal regulations 7 CFR Part

210, Sections 210.1 thru 16, and Sections 210.21 thru 23, including 7 CFR 3015 and

Attachment O of OMB Circular A-102, are considered part of this Contract." [Legal

Requirements/Responsibilities, Section III]; and (ii) "The [Belton School District] shall

ensure that all goods, services, or monies received as the result of a rebate will be utilized

in the DISTRICT'S [sic] nonprofit food service." [Legal Requirements/ Responsibilities,

Section III].

   42. Defendant Sodexho answered the RFPs from Sierra Vista and Belton School

District and was awarded the contracts as the FSMC for the districts.

43.     Upon information and belief, Sodexho invoiced the Sierra Vista and Belton SFAs for costs without crediting them for the rebates, discounts and allowances Sodexho had obtained from food manufacturers and national distributors (no such rebates were reflected on the invoices). Upon information and belief, Sodexho invoices paid by Sierra Vista and Belton with NSLP and SBP entitlement grant funds that reflected costs that were not net of rebates, discounts and allowances as required by applicable NSLP and SBP rules and Federal regulations include, but are not limited to, the following:

(a)     Sierra Vista Public Schools Unified District:

i.      Sodexho Invoice # 1000071745 dated August 7, 2004 in the amount of $15,210.01 paid by check # 20853.

ii.     Sodexho Invoice # 1000074749 dated September 8, 2004 in the amount of $123,571.48 paid by check # 21677.

iii.    Sodexho Invoice # 1000076591 dated November 6, 2004 and 1000080711 dated October 9, 2004 in the amounts of $137,530.21 and $199,621.66, respectively, paid by check # 23013 in the amount of $337, 251.87.

iv.     Sodexho Invoice # 1000090060 dated January 8, 2005 and 1000088521 dated December 4, 2004 in the amounts of $120,919.70 and $154,374.90, respectively, paid by check # 23932 in the amount of $275,294.60.

v.      Sodexho Invoice # 1000099915 dated February 8, 2005 in the amount of $167,731.83 paid by check # 24770.  .

vi.     Sodexho Invoice # 1000102218 dated March 8, 2005 in the amount of $177,687.25 paid by check # 25172.  .

28

vii.     Sodexho Invoice # 1000111944 dated May 7, 2005

and 1000107213 dated April 9, 2005 in the amounts of $176,944.13 and

$155,446.45, respectively, paid by check # 26360 in the amount of $332,390.58.

viii.     Sodexho Invoice # 1000125009 dated July 13, 2005

and 1000119701 dated June 7, 2005 in the amounts of $40,343.86 and $161,630.13,

respectively, paid by check # 27399 in the amount of $201,973.99.

(b)     Belton, Missouri School District:

i.     Sodexho Invoice # 316018 dated March 10, 2003, in

the amount of $131,646.11 paid by check # 37269.

ii.     Sodexho Invoice # 314260 dated February 10, 2003,

in the amount of $130,558.50 paid by check # 36672.

iii.     Sodexho Invoice # 312477 dated January 14, 2003, in

the amount of $106, 150.49 paid by check # 35904.

iv.     Sodexho Invoice # 310675 dated December 11, 2002,

in the amount of $116,024.20 paid by check # 35211.

v.     Sodexho Invoice # 307390 dated November 11, 2002,

in the amount of $165,542.29 paid by check # 34352.

vi.     Sodexho Invoice # 305607 dated October 14, 2002, in

the amount of $147,637.16 paid by check # 33540.

vii.     Sodexho Invoice # 305296 and 305295 dated

September 11, 2002, in the amounts of $9003.73 and $82,821.49, respectively, paid

by check # 32416.

29

viii.    Sodexho Invoice # 300317 dated July 15, 2002, in the amount of $37,937.19 paid by check # 31192.

ix.    Sodexho Invoice # 300316 dated July 15, 2002, in the amount of $7,132.33 paid by check # 31191.

x.    Sodexho Invoice # 1000007017 dated April 17, 2003, in the amount of $129,904.16 paid by check # 38317.

44.    By invoicing Sierra Vista and Belton and receiving payment from NSLP and SBP entitlement grant funds for costs that were not net of rebates received from food manufacturers and national distributors, Sodexho caused false certifications of compliance with applicable NSLP and SBP rules and Federal regulations and the Agreements between SFAs and SAs that were presented to the United States in connection with accessing NSLP and SBP entitlement grant funds. Upon information and belief, SFAs contracting with Sodexho including, but not limited to, those set forth above, obtained NSLP and SBP entitlement grant funds by filing Claims for Reimbursement falsely certifying compliance with applicable NSLP and SBP program rules and Federal regulations and the terms of the Agreements when, in fact, the costs Sodexho was charging the SFAs were neither net of rebates (and thus were effectively equivalent to the prohibited "cost-plus-a-percentage-of-cost" contract) nor, as set forth more fully below, procured in a manner providing full and open competition as required. Claims for Reimbursement including such false certifications caused by Sodexho include, but are not limited to, the following:

(a)    Sierra Vista Public Schools Unified District

i.    NSLP and SBP Claim for Reimbursement dated August 2004 in the amount of $76,164.74;

30

ii. NSLP and SBP Claim for Reimbursement dated

September 2004 in the amount of \$120,693.02;

iii. NSLP and SBP Claim for Reimbursement dated

October 2004 in the amount of \$87,053.48;

iv. NSLP and SBP Claim for Reimbursement dated

November 2004 in the amount of \$108,216.74;

v. NSLP and SBP Claim for Reimbursement dated

December 2004 in the amount of \$66,533.38;

vi. NSLP and SBP Claim for Reimbursement dated

January 2005 in the amount of \$106,878.27;

vii. NSLP and SBP Claim for Reimbursement dated

February 2005 in the amount of \$104,241.14;

viii. NSLP and SBP Claim for Reimbursement dated

March 2005 in the amount of \$90,361.50;

ix. NSLP and SBP Claim for Reimbursement dated April

2005 in the amount of \$114,115.94;

x. NSLP and SBP Claim for Reimbursement dated May

2005 in the amount of \$92,554.50.

(b) Belton, Missouri School District:

i. NSLP and SBP Claim for Reimbursement dated

September 10, 2002 signed by G. Crabtree in the amount of \$14,687.46;

ii. NSLP and SBP Claim for Reimbursement dated

October 14, 2002 signed by G. Crabtree in the amount of \$54,315.85;

31

        iii.    NSLP and SBP Claim for Reimbursement dated November 11, 2002 signed by G. Crabtree in the amount of $64,647.67;

        iv.    NSLP and SBP Claim for Reimbursement dated December 5, 2002 signed by G. Crabtree in the amount of $42,301.70;

        v.    NSLP and SBP Claim for Reimbursement dated January 10, 2003 signed by G. Crabtree in the amount of $40,812.37;

        vi.    NSLP and SBP Claim for Reimbursement dated February 6, 2003 signed by G. Crabtree in the amount of $48,506.80;

        vii.    NSLP and SBP Claim for Reimbursement dated March 7, 2003 signed by G. Crabtree in the amount of $50,750.95;

        viii.    NSLP and SBP Claim for Reimbursement dated April 7, 2003 signed by G. Crabtree in the amount of $52,137.49;

        ix.    NSLP and SBP Claim for Reimbursement dated May 12, 2003 signed by G. Crabtree in the amount of $58,597.29;

        x.    NSLP and SBP Claim for Reimbursement dated April 11, 2003 signed by G. Crabtree in the amount of $56,467.26.

45.    Compliance with NSLP and SBP rules and applicable Federal regulations was a necessary prerequisite of SAs and SFAs for participating in and obtaining Federal NSLP and SBP funds.

46.    The SFAs, contracts, RFPs, invoices, checks and claims identified in the foregoing paragraphs are by way of example only.  Relator possesses voluminous, additional documents of this nature involving other SFAs evidencing Sodexho's wrongdoing as alleged herein that can be added to an amended pleading if necessary.

## 2. **ARAMARK**

47.    Hundreds of cost-reimbursable contracts between Aramark and SFAs during the relevant period expressly provided that Aramark would retain rebates, discounts and allowances from food manufacturers and national distributors in whole or in part. Aramark's contracts with SFAs contained substantially identical provisions with respect to rebates, discounts and allowances stating: "Aramark, as an authorized agent of the District, shall purchase and pay for, as a Direct Cost, all food, supplies and services utilized in District's Food Service Program. . . . Aramark will credit all local trade discounts to District's account. *Cash discounts or discounts not exclusively related to District's Food Service Program shall not be credited to District's account.*"

48.    Aramark contracts containing the foregoing language include, but are not limited to, the following:

(a)    Food Services Management Agreement dated July 30, 2001 between Aramark Educational Services, Inc. and the Board of Education for the School District of Springfield, Missouri for the 2001-2002 school year with the option of four additional terms of one school year each by mutual agreement of the District and Aramark;

(b)    Food Services Management Agreement dated February 2000 between Aramark Educational Services, Inc. and the Central Falls, Rhode Island School District for the 1999-2000 school year with the option of four additional terms of one school year each by mutual agreement of the District and Aramark;

(c)    Food Services Management Agreement beginning July 1, 2004 between Aramark Educational Services, Inc. and the New Haven, Connecticut Board of

Education for the 2004-2005 school year with the option of four additional terms of one school year each by mutual agreement of the District and Aramark;

(d)     Food Services Management Agreement dated April 2003 between Aramark Educational Services, Inc. and the Lake Havasu City, Arizona Unified School District for the period July 1, 2002-June 30, 2003 with the option of four additional terms of one school year each by mutual agreement of the District and Aramark;

(e)     Food Services Management Agreement dated April 11, 2000 between Aramark Educational Services, Inc. and North Haven, Connecticut Public Schools for the 2000-2001 school year with the option of four additional terms of one school year each by mutual agreement of the District and Aramark;

(f)     Food Services Management Agreement dated July 28, 2003 between Aramark Educational Services, Inc. and the San Juan School District in Blanding, Utah for the 2003-2004 school year with the option of four additional terms of one school year each by mutual agreement of the District and Aramark;

49.     Aramark knew, or recklessly disregarded, that its retention of rebates, discounts and allowances caused false claims to be submitted to the United States. The cost-reimbursable contracts in question were awarded to Aramark based on its responses to Requests for Proposal ("RFPs") issued by SFAs, which made clear that SFAs were to receive all rebates and discounts, and mandated FSMC proposal and contract compliance with all applicable NSLP and SBP rules and Federal regulations. For example:

(a)     The RFP dated February 19, 2001 issued by the School District of Springfield, Missouri stated that "The food service program shall be self-supporting and a no-cost operation for the District, [and] shall meet all requirements of the National School

34

Lunch and School Breakfast Programs of the United States Department of Agriculture . . ."
[Specifications 1(a)];

(b)     RFP # 24-01-313 issued by the City of New Haven issued in January 2004 stated that: (i) "The FSMC shall comply with all state, local, and federal laws and regulations, including those requirements and regulations adopted by the Commissioner of Education and the United States Department of Agriculture and any conditions or amendments thereto" [Section 4.8]; and (ii) "The FSMC shall purchase all food and non-food commodities at the lowest price possible, consistent with maintaining quality standards" [Section 13.1].

(c)     RFP No. 01-02-05 issued by the Lake Havasu, Arizona Unified School District #1 stated that "financial incentives that do not accrue to the nonprofit school food service account cannot be used to determine the price submitted" [Instruction 14(f)], and specified that the contract "must be written and conform to all requirements and regulations pertaining to the National School Lunch and National School Breakfast Programs" [Conditions and Specifications Section 2(K)].

(d)     RFP dated November 1, 1999 issued by North Haven, Connecticut Board of Education stated that: (i) "The FSMC shall comply with the rules and regulations of the Commissioner of Education and the United States Department of Agriculture, and any additions or amendments thereto" [Section 14(J)]; and (ii) "The FSMC shall purchase all food and non-food commodities at the lowest price possible, consistent with maintaining quality standards" [Section 19(A)].

(e)     The RFP dated March 17, 2003 issued by the San Juan School District in Blanding, Utah provided that: (i) "The FSMC shall conduct the program

35

operations in accordance with 7 C.F.R. Parts 210, 215, 220, 245 and FCS instructions and policy as currently prescribed and in accordance with any additions or amendments thereto" [Section 10.10]; and (ii) "All costs charged to the SFA must be net of all discounts, rebates, and allowances received by the FSMC. This cost reduction[] must be shown on monthly invoices or operating statements as a credit to the amount billed" [Section 16.5].

50.     Upon information and belief, Aramark invoiced SFAs for costs consistent with the terms of the aforementioned cost-reimbursable contracts and other cost-reimbursable contracts without crediting the SFAs for the rebates, discounts and allowances it had obtained from food manufacturers and national distributors (no such rebates were reflected on invoices). Upon information and belief, Aramark invoices paid by SFAs with NSLP entitlement grant funds that reflected costs that were not net of rebates, discounts and allowances as required by applicable NSLP rules and Federal regulations include, but are not limited to, the following:

(a)     Springfield, Missouri Public Schools: Aramark Invoice # 441943 dated October 25, 2005 (for month of September 2005) in the amount of $614,441.76;

(b)     Central Falls, Rhode Island Public School District:

i.     Aramark Invoice # 480840 dated July 30, 2004 in the amount of $29,587.25 paid by check # 1635.

ii.     Aramark Invoice # 480841 dated August 27, 2004 in the amount of $22,896.75 paid by check # 1639.

iii.     Aramark Invoice # 34660001 dated September 30, 2004 in the amount $24,214.58 paid by check # 1645.

36

        iv.        Aramark Invoice # 480842 dated October 1, 2004 in the amount of $146,132.00 paid by check # 1646.

        v.        Aramark Invoice # 480843 dated October 29, 2004 in the amount of $136,670.75 paid by check # 1655.

        vi.        Aramark Invoice # 40843-44 and 48045 dated November 26, 2004, and December 31, 2004, in the amounts of $108,045.09 and $118,069.85 paid by check # 1660 in the amount of $226,114.94.

        vii.        Aramark Invoice # 480847 and 480848 dated January 28, 2005, and February 25, 2005, in the amounts of $110,980.33 and $119,112.85, respectively, paid by check # 1666 in the amount of $230,093.18.

        viii.        Aramark Invoice # 480849 and 480850 dated March 2005 and April 1, 2005, in the amounts of and $139,136.77 and $105,846.17, respectively, paid by check # 1668 in the amount of $244,982.94.

        ix.        Aramark Invoice # 480851 dated May 27, 2005 in the amount of $137,194.30 paid by check # 1671 in the amount of $59,092.23 and check # 1673 in the amount of 78,102.07.

        (c)        New Haven, Connecticut School District: Aramark Invoice # KC00652337 in the amount of $451,920.82 paid by check # 75381.

        (d)        North Haven, Connecticut School District:

        i.        Aramark Invoice # KC00651473 dated October 12, 2004 in the amount of $ 113,159.96 paid by check # 100290.

        ii.        Aramark Invoice # KC00652350 dated November 18, 2004 in the amount of $100,454.76 paid by check # 100300.

37

(e)     San Juan School District, Blanding Utah:

i.     Aramark Invoice # 427038 dated February 5, 2004 in the amount of $75,487.66 paid by check # 51875;

ii.     Aramark Invoice # 427039 dated February 27, 2004 in the amount of $70,685.99 paid by check # 52506;

iii.     Aramark Invoice # 427040 dated April 2, 2004 in the amount of $86,390.03 paid by check # 53379.

51.     By invoicing SFAs and receiving reimbursement for costs that were not net of rebates received from food manufacturers and national distributors, Aramark caused false certifications of compliance with applicable NSLP and SBP rules and Federal regulations and the Agreements between SFAs and SAs to be submitted to the United States in connection with accessing NSLP and SBP entitlement grant funds.   Upon information and belief, SFAs contracting with Aramark, including, but not limited to, those set forth above, obtained NSLP and SBP entitlement grant funds by filing Claims for Reimbursement falsely certifying compliance with applicable NSLP and SBP program rules and Federal regulations and the terms of the Agreements when, in fact, the costs Aramark was charging the SFAs were neither net of rebates (and thus were effectively equivalent to the prohibited "cost-plus-a-percentage-of-cost" contracts) nor, as more fully set forth below, procured in a manner providing full and open competition as required. Claims for Reimbursement including such false certifications caused by Aramark include, but are not limited to, the following:

38

(a)     Springfield, Missouri School District:  NSLP and SBP Claim for

Reimbursement for month of September 2005 in the amount of $413682.60 and

$112,478.74, respectively.

(b)     Central Falls, Rhode Island School District:

i.     NSLP and SBP Claim for Reimbursement dated

September 1, 2004 in the amount of $129,091.77.

ii.     NSLP and SBP Claim for Reimbursement dated

October 1, 2004 in the amount of $119,387.26.

iii.     NSLP and SBP Claim for Reimbursement dated

November 1, 2004 in the amount of $113,237.18.

iv.     NSLP and SBP Claim for Reimbursement dated

December 1, 2004 in the amount of $101,954.86.

v.     NSLP and SBP Claim for Reimbursement dated

January 1, 2005 in the amount of $114,070.20.

vi.     NSLP and SBP Claim for Reimbursement dated

February 1, 2005 in the amount of $101,769.80.

vii.     NSLP and SBP Claim for Reimbursement dated

March 1, 2005 in the amount of $144,740.53.

viii.     NSLP and SBP Claim for Reimbursement dated April

1, 2005 in the amount of $91,127.92.

ix.     NSLP and SBP Claim for Reimbursement dated May

1, 2005 in the amount of $136,721.04.

39

                    x.        NSLP and SBP Claim for Reimbursement dated June

1, 2005 in the amount of $94,785.73.

                (c)      New Haven, Connecticut School District:  Claim for Reimbursement

for the month of October 2004 in the amount of $746,276.79.

                (d)      San Juan School District, Blanding, Utah:

                    i.       NSLP Claim for Reimbursement dated February 4,

2004 signed by Rhea Laws in the amount of $81,730.18;

                    ii.      NSLP Claim for Reimbursement dated March 3, 2004

signed by Rhea Laws in the amount of $91,420.79;

                    iii.     NSLP Claim for Reimbursement dated April 2, 2004

signed by Rhea Laws.

52.      Compliance with NSLP and SBP rules and applicable Federal regulations was a necessary prerequisite of SAs and SFAs for participating in and obtaining Federal NSLP and SBP funds.

53.      The SFAs, contracts, RFPs, invoices, checks and claims identified in the foregoing paragraphs are by way of example only.   Relator possesses voluminous, additional documents of this nature involving other SFAs evidencing Aramark's wrongdoing as alleged herein that can be added to an amended pleading if necessary.

**3.**     **<u>CHARTWELLS</u>**

54.      Upon information and belief, Chartwells entered into hundreds of cost-reimbursable contracts with SFAs pursuant to which Chartwells retained rebates, discounts and allowances from food manufacturers.  Chartwells' contracts with SFAs including, but not limited to, those set forth below, made clear that rebates were to be retained by the

school districts and that the lowest reasonable price should be obtained for food purchased on the SFAs' behalf, and promised that applieable Federal regulations ineluding those set forth above would be strictly observed. For example:

(a)     The Poplar Bluff Sehool District' July 1, 2003 agreement with Chartwells stated that: (i) "Chartwells agrees to strictly observe all applieable State and Federal statutes, rules and regulations which now exist or which may be promulgated during the term of this agreement or extension thereof; i.e., 'Current Federal Regulations 7 CFR Part 210, Sections 210.1 through 16. And sections 210.21 thru 23, including CFR 3015, Subpart S,' as well as with the applicable provisions of the National School Lunch Act as amended, the Sehool Breakfast Program and the Department of Agriculture regulations set forth in 7 CFR 220, 7 CFR 245, 7 CFR 250 and any requirements imposed by any applicable state agency" [Food Service Agreement, Article 1.2]; (ii) "Chartwells must competitively procure all acquisitions funded in whole or in part with nonprofit food service account funds. Chartwells agrees to purchase all food for the SFA at the lowest prices possible consistent with maintaining the quality standards prescribed by the SFA, including taking advantage of all local trade discounts. All procurement transactions must meet procurement standards set by the United States Department of Agrieulture. Transactions shall be eonducted in a manner so as to provide maximum open and free eompetition, as provided by law" [Food Service Agreement, Article 7.2]; (iii) "All goods, services or moneys received as a result of a commodity rcbate, to include rebatc payments for proeessed donated foods, will be utilized in the SFA's nonprofit food service" [Article 7.3] ; (iv) "Chartwells shall invoice the SFA monthly a sum not to exceed the amount necessary to cover Chartwells' expenditures for the food service operation" [Article 9.5];

41

and (v) "Costs charged to the SFA are reimbursable only to the extent that they are allowable costs" [Article 10.2].

        (b)     The June 10, 1999 agreement between Chartwells and the Board of Education of Mahtomedi, Minnesota Public Schools provided that: (i) "In managing the food service operation, Chartwells shall comply with the applicable provisions of the National School Lunch Act, as amended, and the United States Department of Agriculture ("USDA") regulations set forth in 7 C.F.R. 210 . . . and all other applicable laws, ordinances, regulations and rules of federal, state and local authorities" [Article 1]; and (ii) "Chartwells shall purchase all food for the District as a direct cost of operation at the lowest prices possible consistent with maintaining the quality standards prescribed by the District . . . . Preference will be given to local suppliers wherever practical. Chartwells will take advantage of all local trade discounts, and prices negotiated for local billing will be at levels at least as favorable as prices otherwise available in the area" [Article 8].

        (c)     Article 10.1 of the June 7, 2005 Food Service Program Management Agreement between Chartwells and the Madison Board of Education provides that: "Chartwells shall comply with all applicable laws, ordinances, rules and regulations relating to Food Service sanitation, safety and health, including, but not limited to, the following: A. National School Lunch Program (in particular Title 7, Code of Federal Regulations Section 210, 245, et seq.). . . ."

        (d)     The cost-reimbursable contract between Chartwells and the Farmington, Minnesota SFA provides that: (i) "The SFA shall receive any discounts or rebates for purchases made on their behalf" [Section XII.B] and (ii) "the FSMC shall comply with the rules and regulations of the CFL and the USDA, and any additions or

42

amendments thereto, including but not limited to, 7 CFR Parts 210, 215, 220, 245, and 250 and 225, if applicable.." [Section I.K]

(e)     The June 30, 2001 cost-reimbursable contract between Chartwells and the Wilton, Connecticut, SFA provides that: (i) "Chartwells will purchase all food for the SFA at the lowest prices possible consistent with maintaining the quality standards prescribed by the SFA, including taking advantage of all local trade discounts" [Article 7.2]; and (ii) "Chartwells shall comply with the applicable provisions of the National School Lunch Act as amended, the School Breakfast Program and the Department of Agriculture regulations set forth in 7 CFR 210, 7 CFR 220, 7 CFR 245, 7 CFR 250 and any requirements imposed by an applicable state agency" [Article 1.2].

55.     Chartwells knew, or recklessly disregarded, that its retention of rebates, discounts and allowances caused false claims to be submitted to the United States. The cost-reimbursable contracts in question were awarded to Chartwells based on its responses to Requests for Proposal ("RFPs") issued by SFAs, which made clear that SFAs were to receive all rebates and discounts, and mandated proposal ad contract compliance with all applicable NSLP and SBP rules and Federal regulations. For example:

(a)     The Poplar Bluff R-1 School District RFP for School Food Service Management for the 2003-2004 school year stated that: (i) "The food service provided shall be operated and maintained as a benefit to the District students, faculty and staff and not as a source of profit to the FSMC;" [Section II.E.2.c] (ii) "The FSMC agrees to strictly observe all applicable State and Federal statutes, rules and regulations which now exist or which may be promulgated during the term of this agreement or extension thereof; i.e., "Current Federal Regulations 7 CFR Part 210, Sections 210.2 through .16, and Sections

43

210.21 through .23, including 7 CFR 3015, Subpart S;" [Section II.E.2.f] (iii) "The food

service program shall meet all requirements of the National School Lunch and School

Breakfast Programs of the United States Department of Agriculture. . . . Costs charged to

the District are reimbursable only to the extent that they are allowable costs, net of all

credits, discounts or rebates" [Section III.A].

   (b) The Madison, Connecticut Public Schools' RFP dated March 14,

2005, stated that: (i) "The FSMC shall comply with all laws, rules, regulations and policies

of federal, state and local governments . . . including but not limited to . . . The National

School Lunch Act (42 U.S.C. § 1751 *et seq*) . . . [and] 7 CFR Parts 210, 215, 220, 235, 245

and 250 and any additions or amendments thereto" [Section II.A.12]; (ii) "The FSMC shall

purchase all food and non-food commodities at the lowest price possible consistent with

maintaining quality standards. The SFA shall receive any discounts or rebates for

purchases made on their behalf" [Section II.M]; and (iii) "The FSMC shall be responsible

for purchasing standards and specifications to bring about the best quality and price for the

SFAs food service program. . . . The FSMC shall adhere to procurement standards

specified by federal, state and local laws, rules, regulations and policies" [Section II.M].

   (c) A 2004 RFP issued by the Farmington, Minnesota Independent

School District provided that: (i) "Reimbursement for cost of goods will be the actual

purchases as documented by invoices less all discounts and rebates taken by the company.

Where rebates are not made directly to the FSMC without designation made to specific

FSMC accounts, the FSMC will prorate the discount and credit the SFA" [General

Information, Section M]; (ii) The FSMC shall comply with the rules and regulations of the .

. . USDA, and any additions or amendments thereto, including but not limited to, 7 CFR

Parts 210, 215, 220, 245 and 250 and 225, if applicable . . ." [Section 1.K]; and (iii) "The SFA shall receive any discounts or rebates for purchases made on their behalf" [Section XII.B].

56.     Upon information and belief, Chartwells invoiced SFAs for costs without crediting the SFAs for the rebates, discounts and allowances it had obtained from food manufacturers and national distributors (no such rebates were reflected on invoices). Upon information and belief, Chartwells' invoices paid by SFAs with NSLP and SBP entitlement grant funds that reflected costs that were not net of rebates, discounts and allowances as required by applicable NSLP and SBP rules and Federal regulations include, but are not limited to, the following:

(a)     Poplar Bluff School District:

i.     Chartwells Invoice # X080750204 dated October 31, 2003 in the amount of $174,128.68;

ii.     Chartwells Invoice # X080750304 dated November 30, 2003 in the amount of $154,552.02;

(b)     Mahtomedi, Minnesota Public Schools: Chartwells Invoice dated October 1999 in the amount of $79,724.74 paid by check # 65448;

(c)     Madison, Connecticut Public Schools:  Chartwells Invoice # X164950106 dated September 30, 2005 in the amount of $87,962.82 paid by check # 41918.

(d)     Farmington, Minnesota Public Schools:

i.     Chartwells Invoice # X129350205 dated October 31, 2004, in the amount of $159,789.10;

          ii.      Chartwells Invoiee # X129350305 dated November

30, 2004, in the amount of $178,377.68;

      57.     By invoicing SFAs and reeeiving reimbursement for eosts that were not net

of rebates received from food manufacturers and national distributors, Chartwells caused

false certifications of compliance with applicable NSLP and SBP rules and Federal

regulations and the terms of the by Agreements between SFAs and SAs to be submitted to

the United States in connection with accessing NSLP and SBP entitlement grant funds.

Upon information and belief, Chartwells' SFA customers, including, but not limited to,

those set forth above, obtained NSLP and SBP entitlement grant funds by filing Claims for

Reimbursement falsely certifying compliance with applicable NSLP and SBP program

rules and Federal regulations and the terms of the Agreements when, in fact, the costs

Chartwells was charging the SFAs were neither net of rebates (and thus were effectively

equivalent to the prohibited "cost-plus-a-percentage-of-cost" contract) nor, as more fully

set forth below, procured in a manner providing full and open competition as required.  In

certain instances, pursuant to Chartwells' contract with the SFAs, these Claims for

Reimbursement were prepared by Chartwells for the SFAs signature.    Claims for

Reimbursement including such false certifications caused by Chartwells include, but are

not limited to, the following:

      (a)    Poplar Bluff School District:

         i.      NSLP and SBP Claim for Reimbursement dated

November 17, 2003, submitted by E. Lawson, in the amount of $138,777.08;

        ii.      NSLP and SBP Claim for Reimbursement dated

December 15, 2003, submitted by E. Lawson, in the amount of $118,895.02;

46

(b)    Mahtomedi, Minnesota Public Schools:

i.    NSLP Claim for Reimbursement dated September 1999, in the amount of $4,897.79;

ii.    NSLP Claim for Reimbursement dated October 1999, in the amount of $5,543.97;

iii.    NSLP Claim for Reimbursement dated November 1999, in the amount of $6,075.18;

iv.    NSLP Claim for Reimbursement dated December 1999, in the amount of $4,904.63;

v.    NSLP Claim for Reimbursement dated January 2000, in the amount of $6,169.90;

vi.    NSLP Claim for Reimbursement dated February 2000, in the amount of $6,199.67;

vii.    NSLP Claim for Reimbursement dated March 2000, in the amount of $6,008.16;

viii.    NSLP Claim for Reimbursement dated April 2000, in the amount of $5,992.35;

ix.    NSLP Claim for Reimbursement dated May 2000, in the amount of $6,820.03;

x.    NSLP Claim for Reimbursement dated June 2000, in the amount of $1,798.73;

(c)    Farmington Minnesota Public Schools:

47

       i.   NSLP and SBP Claims for Reimbursement dated October 2004, in the amount of $30,468.76;

       ii.   NSLP and SBP Claims for Reimbursement dated November 2004, in the amount of $33,640.39.

   58.   Compliance with NSLP and SBP rules and applicable Federal regulations was a necessary prerequisite of SAs and SFAs for participating in and obtaining Federal NSLP and SBP funds.

   59.   The SFAs, contracts, RFPs, invoices, checks and claims identified in the foregoing paragraphs are by way of example only. Relator possesses many additional documents of this nature involving other SFAs evidencing Chartwells' wrongdoing as alleged herein that can be added to an amended pleading if necessary.

**B.**  **Defendants' Failure To Seek Competitive Bids**

   60.   Although applicable Federal regulations required all procurement transactions using Federal grant funds to be conducted in a manner providing full and open competition, as a result of their lucrative deals funneled through national distributors, Defendants lacked any incentive to, and did not, seek bids from local distributors. Such local distributors offered the lowest price consistent with quality for food being purchased on behalf of SFAs because they did not offer Defendants rebates on any "rigged spread" like that Defendants arranged through national distributors and were, therefore, able to sell food and supplies to SFAs at prices not inflated by the rigged spread. Local distributors only added their mark-up to their net cost. As a result, Defendants had every incentive to and did purchase food from national distributors who willingly marked up the higher "into distribution price" Defendants negotiated with food manufacturers and, additionally,

offered the Defendants the opportunity to obtain rebates for such things as drop size, prompt payment, Web-based ordering and buying goods branded with the distributors' names.

61.    Defendants' failure to seek competitive bids from local distributors drained millions of dollars from the NSLP and SBP programs. For example, the average cost per program lunch for food in Sodexho-managed SFAs in Connecticut was 25% higher than in self-operated districts in Connecticut in 2002-2003 ($0.94 in Sodexho-managed districts as opposed to $0.75 for self-operated Connecticut school districts). Further evidencing the competitive pricing of local distributors over that offered by Defendants, who funneled their purchases through national distributors, Thurston, a local distributor serving Connecticut, Rhode Island, Massachusetts and parts of New Hampshire and New York, won a competitive bid to sell food to self-operated districts in the EastConn, Connecticut buying co-op for the 2006-2007 school year. A comparison of prices for 147 food and supply items purchased by EastConn (using local distributor Thurston or a permitted alternative under the EastConn-Thurston buying agreement) with prices for the same or similar items purchased by Sodexho and Chartwells (using national distributors) on behalf of Sierra Vista, Arizona SFA; Yuma, Arizona SFA; Snowflake, Arizona SFA; Poplar Bluff, Missouri SFA; and Branford, Connecticut SFA, confirms that FSMC prices using a national distributor are routinely higher than those of local distributors. With respect to all but 14 of the 146 items, the price paid by EastConn was lower, sometimes substantially so, than the price charged by Sodexho and Chartwells. For the 14 items as to which EastConn's price was higher, the price differential ranged from a low of 38 cents (for Gatorade) to as much as $5.23 (for breadsticks). With respect to the 133 items as to which

49

Sodexho and Chartwells' prices were higher, the price differential was far more pronounced, ranging from a low of 2 cents (for animal crackers) to a high of $24.92 (for napkins). A total of 26 items as to which Sodexho and Chartwells' prices were higher had a greater price differential than $5.23, which was the largest spread between prices in the few instances in which EastConn's price was higher. With respect to 10 of these 26 items, the price differential was greater than $10.

62.    This experience was not unique to Connecticut or the Northeast. According to the Executive Director of Finance for the Norman, Oklahoma School District, when a State audit of the district revealed that Sodexho was not obtaining price quotes when purchasing food for the district, she requested that Sodexho do so. After a year of unanswered requests for bids from Sodexho, Norman obtained bids from Sysco directly, which were lower than the prices Sodexho had been charging the Norman school district using Sysco as its national distributor.

## CLAIM FOR RELIEF

## VIOLATION OF THE FALSE CLAIMS ACT,
## 31 U.S.C. § 3729(a)(1) and (2)

63.    The allegations contained in paragraphs 1 through 62 above are realleged as if fully set forth herein.

64.    As set forth above, by retaining rebates from food manufacturers and national distributors and failing to procure food for their SFA customers in a manner promoting open and fair competition in violation of the NSLP, the SBP and applicable Federal regulations, Defendants (i) knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1); and (ii) knowingly made, used or caused to be made or used, a false record or

50

statement to get a false or fraudulent claim paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2). False certifications by SFAs contained in Claims for Reimbursement submitted to SAs that the claims were in accordance with the terms of the Agreements between the SFAs and SAs and/or applicable Federal regulations mandating compliance with, *inter alia*, 7 C.F.R. §§ 210, 220, 3015 and 3016, were material misrepresentations made to obtain a government benefit. Paying that benefit resulted in funds, that should have remained in the NSLP and SBP programs at SFAs where Defendants were operating, being siphoned off by Defendants, along with Defendants incurring non-competitive prices on behalf of SFAs for food and supplies, as a result of which the federal programs were being operated with far less money than should have remained in the programs to their serious detriment.

65.     The claims which are the basis of this cause of action were submitted by Defendants' SFA clients nationwide.

66.     Defendants acted knowingly when they caused to be made or used the false records set forth above in order to get a false or fraudulent claim paid or approved by the Government.

67.     The United States has been damaged as a result of Defendants' violations of the False Claims Act as Federal entitlement grant money has been paid to Defendants for improper purposes.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests this Honorable Court to enter an Order granting the following relief:

51

(a)     Civil penalties against each Defendant of not less than $5,000 and not more than $11,000 per false claim;

(b)     Three times the amount of damages which the United States has sustained because of the acts of the Defendants to be determined at trial;

(c)     Reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and prosecuting this case, as well as pre- and post-judgment interest;

(d)     The Relator be awarded the maximum amount allowed to him pursuant to the FCA; and

(e)     Any and all other relief that this Honorable Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff/Relator demands a trial by jury as to all issues triable by a jury.

Done this 30th day of July, 2007.

Respectfully submitted,

WHATLEY DRAKE & KALLAS, LLC

By: _____

Deborah Clark-Weintraub
Anil A. Mujumdar
1540 Broadway, 37th Floor
New York, NY 10036
Telephone:     (212) 447-7070
Facsimile:      (212) 447-7077
dweintraub@wdklaw.com
amujumdar@wdklaw.com

Respectfully submitted,

WHATLEY DRAKE & KALLAS, LLC

By: _____

Deborah Clark-Weintraub
Anil A. Mujumdar
1540 Broadway, 37th Floor
New York, NY 10036
Telephone:    (212) 447-7070
Facsimile:    (212) 447-7077
dweintraub@wdklaw.com
amujumdar@wdklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing by U.S. mail to the following on this 31st day of July, 2007:

> Patrick Meehan, Esq.
> Joseph Trautwein, Esq.
> United States Attorney's Office
> 615 Chestnut Street, Suite 1250
> Philadelphia, Pennsylvania 19106

I further hereby certify that under the dictates of 18 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d)(4), the instant Amended Complaint has been served only upon the foregoing party and not upon Defendants Sodexho, Inc., Aramark Corporation, and Compass Group USA, Inc.

_____
OF COUNSEL

FILED

AUG 1

MICHAE
By

FII

AUG

MICHAE
By