**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| UNITED STATES, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| ROBERT PRITSKER, | : | |
| Relator, | : | |
| | : | |
| v. | : | |
| | : | |
| SODEXHO, INC., et al., | : | No. 03-6003 |
| Defendants. | : | |


<u>**MEMORANDUM AND ORDER**</u>


Schiller, J.                                                          March 6, 2009

> This case concerns alleged fraud in the school lunch room.  In order to understand the allegations in this case, it is important to understand the players and agencies involved.  For the reader's convenience, the following is key of acronyms used throughout this opinion:

| Acronym | Definition |
|---|---|
| FNS | Food and Nutrition Service |
| FSMC | Food Service Management Company |
| GAO | Government Accountability Office (previously known as the General Accounting Office) |
| NSLP | National School Lunch Program |
| OIG | Here, the USDA Office of Inspector General |
| OMB | Office of Management and Budget |
| RFP | Request for Proposal |
| SA | State Agency |
| SFA | School Food Authority |
| USDA | United States Department of Agriculture |

Relator Robert Pritsker brings this *qui tam* action on behalf of the United States against Defendants Sodexho, Inc.; Sodexho America, LLC; Sodexho Marriott Management, Inc. (collectively "Sodexo"); Aramark Corporation; Aramark Educational Services, Inc. (collectively "Aramark"); and Compass Group, USA, Inc. d/b/a Chartwells ("Chartwells"). The Defendants are Food Service Management Companies ("FSMCs") that manage food services for local School Food Authorities ("SFAs") participating in the federally-funded National School Lunch Program ("NSLP") and School Breakfast Program ("SBP"). Relator alleges that Defendants violated the False Claims Act ("FCA") by failing to pass rebates, discounts and credits through to the SFAs, thereby causing the SFAs and overseeing State Agencies ("SAs") to falsely certify that their programs complied with applicable federal regulations. Relator also alleges that Defendants failed to comply with federal procurement regulations, causing SFAs and SAs to falsely certify compliance with those regulations. Currently before the Court are Defendants' motions to dismiss for lack of subject matter jurisdiction pursuant to the FCA's jurisdictional bar, 31 U.S.C. § 3730(e)(4), and for failure to state a claim. For the following reasons, Defendants' motions are granted.

## I.    BACKGROUND

### A.    Administration of the NSLP and SBP

The NSLP and SBP are federally-funded entitlement grant programs that provide cash and United States Department of Agriculture ("USDA") commodities to non-profit school food services. The USDA administers the NSLP and SBP through the Food and Nutrition Service ("FNS"). 7 C.F.R. §§ 210.3(a), 220.3(a) (2009). FNS contracts with SAs, which contract with local SFAs, which, in turn, implement the federal programs. Both FNS's contracts with SAs and SA's contracts

with SFAs require the parties to abide by applicable federal regulations.  (Clark-Weintraub Decl. Ex. 1 [FNS contract with Conn. Dep't of Educ.] & Ex. 2 [Conn. Dep't of Educ. form contract with SFAs].)  To obtain reimbursement from the federal government, SFAs must certify to SAs the number of meals served.  Pursuant to these reimbursement requests, FNS reimburses SFAs, through SAs, on a cost-per-meal basis.[1]  *See* 7 C.F.R. §§ 210.7, 210.8, 220.11.  The SFA representative who signs the certification must attest that the claim is correct and supported by available records and that the claim is made in accordance with the terms of existing agreements.  *Id.* § 210.8(c); (Clark-Weintraub Decl. Ex. 4 [Claim Reimbursement Form].)

Federal regulations permit SFAs to contract with FSMCs to manage food service operations and purchase food products on behalf of the SFA.  7 C.F.R. § 210.16.  SFAs solicit bids from FSMCs by issuing a request for proposal ("RFP"), which specifies the contract requirements.  When the relationship is governed by a cost-reimbursable contract, as is true here, the FSMC purchases food on the SFA's behalf and submits the invoices to the SFA for repayment from the nonprofit school food service account.[2]

The federal regulations governing NSLP and SBP require SAs and SFAs, as grantees and subgrantees of federal funds, to abide by the federal procurement regulations at 7 C.F.R. Parts 3016 and Part 3019 "concerning the procurement of all goods and services with non-profit school food service account funds."  7 C.F.R. §§ 210.21(a) (governing NSLP), 220.16(a) (governing SBP).  Part

---

[1] Relator does not allege that Defendants misrepresented the number of meals served.

[2] A nonprofit school food service account is a "restricted account in which all of the revenue from all food service operations conducted by the [SFA] principally for the benefit of school children is retained and is used only for the operation or improvement of the nonprofit school food service." 7 C.F.R. § 210.2.

3

3016 requires grantees and subgrantees of federal funds, like SAs and SFAs, to conduct procurement transactions "in a manner providing full and open competition." *Id.* § 3016.36(c). The regulations at that part pertaining to financial administration limit use of federal funds to "[t]he allowable costs of the grantees [and] subgrantees" and direct state and local governments to the principles of Office of Management and Budget ("OMB") Circular A-87 to determine which costs are allowable. *Id.* § 3016.22. OMB Circular A-87, codified at 2 C.F.R. Part 225, requires that to be allowable, costs paid from federal funds "[b]e the net of all applicable credits." 2 C.F.R. Part 225 Appx. A § (C)(1)(i). Applicable credits are "those receipts or reduction of expenditure-type transactions that offset or reduce expense items allocable to Federal awards as direct or indirect costs," such as "[p]urchase discounts, rebates or allowances, recoveries or indemnities on losses, insurance refunds or rebates, and adjustments of overpayments or erroneous charges." *Id.* § (C)(4)(a).

### B. OIG Investigates FSMC Rebate Retention

In August, 1996 GAO issued a report that broadly reviewed the use of private food establishments by schools participating in federal programs. It found, among other things, "that some FSMC contracts contain provisions allowing FSMCs to receive some of the rebates and discounts obtained from vendors." *GAO Report, School Lunch Program: Role and Impacts of Private Food Service Companies* 37 (1996). The USDA Office of Inspector General ("OIG") subsequently initiated regional audits to investigate the extent to which FSMCs retained rebates, discounts and credits instead of passing them through to the SFAs. *See* Southeast Region Audit, OIG, USDA, Report No. 27601-10-At, *Food and Nutrition Service National School Lunch Program Controls Over Food Service Management Companies, South Carolina School Years 1997 Through 1999* 1 (Feb. 2001) ("Prior [OIG] audits and investigations disclosed that FSMC does not always

4

pass on to SFA the full value of . . . discounts and rebates on commercial purchases.”); Southwest Region Audit, OIG, USDA, Report No. 27601-9-Te, *Food and Nutrition Service National School Lunch Program Food Service Management Companies* (Mar. 2001) (auditing New Mexico FSMCs); Western Region Audit, OIG, USDA, Report No. 27099-15-SF, *Food and Nutrition Service National School Lunch Program Food Service Management Companies* (Apr. 2001) (auditing Washington State FSMC).

In April 2002, OIG published an audit report compiling six regional investigations of the NSLP as operated by FSMCs nationwide. Midwest Region Audit, OIG, USDA, Report No. 27601-0027-CH , *Food and Nutrition Service National School Lunch Program Food Service Management Companies* (Apr. 2002) [hereinafter April 2002 Audit]. The audit’s stated objectives were to “determine whether sufficient controls exist[ed] to ensure that (1) food service management companies credit SFA’s for the full value of . . . purchase discounts and rebate[s] as applicable; and (2) that management companies and SFA’s administered the NSLP in accordance with applicable laws, regulations, and FNS guidelines.” *Id.* at 2.

The audit, which assumed that FSMCs engaged in cost-reimbursable contracts were required to pass discounts or rebates through to SFAs, concluded that “the purchase discounts . . . were used to enrich the management companies instead of benefiting [*sic*] the SFA’s as required by Federal regulations.” *Id.* at 5 (footnote omitted). Specifically, the audit revealed that:

> Two management companies that maintained cost-reimbursable contracts nationwide profited at the expense of 7 of the 19 SFA’s we reviewed by retaining over $280,000 in discounts and rebates they received on purchases made for their food service operations. To accomplish this, the management companies amended, eliminated, or ignored terms included in the requests for proposal issued by the SFA’s.

*Id.* at ii. OIG’s conclusions relied on the premise that OMB Circular A-87's allowable cost

5

principles required FSMCs to bill costs net of all applicable credits.  *Id.* at 11, 11 n.5.

OIG recommended that states require new contracts with FSMCs to expressly declare that the FSMC will pass rebates and other discounts through to the SFA.  *Id.* at iii.  It also recommended that FNS issue a statement providing guidance to SAs so as to ensure compliance with regulations mandating the pass through of rebates.  *Id.* at 14-15.  A June 2002 news article reported on the audit, publicizing its findings to the food service industry.  Paul King, *USDA Report Contractors Skimmed Millions From Lax Education Clients,* Nation's Restaurant News (June 3, 2002), *available at*, http://findarticles.com/p/articles/mi_mi3190/is_22_36/ai_86762976/print?tag=artBody;col1  (last visited Feb. 26, 2009).

### C.    FNS determines that OMB Circular A-87 does not apply to cost-reimbursable contracts between FSMCs and SFAs

Shortly after the large-scale audit was conducted, FNS changed its position regarding the applicability of OMB Circular A-87 to cost-reimbursable contracts between SFAs and FSMCs.  On November 26, 2002, Stanley Garnett, Director of the Child Nutrition Division of FNS,[3] issued a management alert to the Regional Directors of Child Nutrition Programs announcing that:

> Recently, we met with officials of [OMB] concerning the applicability of OMB circulars to contracts between [SFAs] and [FSMCs].  OMB has determined that its circular requirements for net costs, i.e., allowable costs must be net of all credits, discounts and rebates, do not apply to the nonprofit school food service account for expenditures resulting from the contracts between the SFA and FSMC.

(Aramark Mot. Ex. H [Nov. 26, 2002 Management Alert]).  Accordingly, explicit contract terms were necessary to require FSMCs to pass through rebates to SFAs.  However, FNS "strongly encouraged" SFAs to include such provisions in their cost-reimbursable contracts with FSMCs. (*Id.*)

---

[3]   The Child Nutrition Division is the arm of FNS responsible for administering the NSLP and SBP.  7 C.F.R. §§ 210.3(a), 220.3(a).

FNS reiterated this position in a December 17, 2002 memo:

> This memorandum is intended to rescind the prohibition against FSMCs receiving the value of credits, discounts and rebates under certain conditions.  The OMB determined its circular requirements for net costs, i.e., allowable costs must be net of all credits discounts and rebates do not apply to the nonprofit school food service account for expenditures resulting from cost reimbursement contracts between the SFAs and FSMCs.

> In light of this interpretation [FNS] strongly encourages the inclusion of provisions in all cost reimbursable contracts that require FSMCs only charge allowable costs that are net of credits, discounts, and rebates received by the FSMC.  Please realize that SFAs failing to include such a provision in its contracts may be liable to the FSMC for payment of costs in excess of the actual net costs incurred by the FSMC. Since the OMB made it clear that State agencies and SFAs can impose compliance with net cost requirements through contractual terms, FNS will fully support State agencies and SFAs that elect to require contract terms that protect the financial integrity of the program.

(Clark-Weintraub Decl. Ex. 7 [Dec. 17, 2002 Rankin Memo].)  FNS subsequently restated this position three times.  (Sodexo's Mot. to Dismiss Furey Aff. Ex. 12 [Jan. 15, 2003 Memo] ("OMB Circular requirements stating that allowable costs must be net of all credits, discounts and rebates, do **<u>NOT</u>** apply to the nonprofit school food service account for expenditures resulting from the contracts between the school food authority (SFA) and the FSMC."); Ex. 13 [May 20, 2003 Letter from Dir. of Child Nutrition Div.] at Question 5 ("FNS strongly encourages, but does not require, that all cost reimbursable contracts include provisions to ensure SFAs are only charged net, allowable costs."); Ex. 14 [July 9, 2004 Letter from Dir. of Child Nutrition Div.] (declaring that position expressed in May 20, 2003 letter "remains unchanged").

### D.      FNS Takes Regulatory Action

On July 9, 2003, Phyllis K. Fong, Inspector General of the USDA testified before the United States House of Representatives Committee on the Budget regarding fraud, waste and abuse in

mandatory spending programs.  (Furey Aff. Ex. 15 [Fong Testimony].)  During her testimony, Fong

identified "local school food authority contracts with food service providers" as susceptible to fraud,

waste or abuse.  (*Id.* at 20.)  She testified that:

> OIG is working with FNS to address cost reductions in the form of contract
> discounts, rebates, and allowances.  Federal cost principles require that such benefits
> accrue to the program.  However, [OMB] has recently determined that Federal cost
> principles do not apply to local contracts with [FSMCs].  FNS is pursuing regulatory
> action to address this problem.

(*Id.* at 20.)

On December 30, 2004, FNS issued a proposed rule that sought to implement changes to

NSLP and SBP regulations.  *Procurement Requirements for the National School Lunch, School*

*Breakfast and Special Milk Programs*, 69 Fed. Reg. 78340 (proposed Dec. 30, 2004).  The rule

intended to "clarify that only costs resulting from cost reimbursable contracts or cost reimbursable

contract provisions that meet applicable cost allowability requirements are allowable nonprofit

school food service account expenditures."  It further sought to "prohibit contract terms that allow

payments from the nonprofit school food service account in excess of the contractor's actual net

allowable costs."  *Id.* at 78342.  The rule was partially motivated by the findings of OIG's April 2002

audit regarding FSMCs' retention of credits, discounts and rebates.  *Id.* at 78341.  After a comment

period, the changes were finalized and made effective as of November 30, 2007.  *Procurement*

*Requirements for the National School Lunch, School Breakfast and Special Milk Programs*, 72 Fed.

Reg. 61479-01 (Oct. 31, 2007).

Despite this proposed regulatory action, OIG, which disagreed with FNS's position on

Circular A-87's applicability, continued to investigate rebate-related abuses.  *See* Great Plains Region

Audit, OIG, USDA, Report No. 27601-15-KC, *Food and Nutrition Service National School Lunch*

*Program Cost-Reimbursable Contracts with a Food Service Management Company* 8 (Dec. 2005) [hereinafter "December 2005 Audit"] (noting that, despite FNS's position, "[w]e continue to believe that the costs billed by the company to its SFAs with cost-reimbursable contracts should be the net costs incurred by the company"). A December 2005 audit investigated Defendant Chartwells to determine whether it "passed on cost savings on food purchases to SFAs when required to do so by contract" and determined, from a review of 106 contracts, that Chartwells retained at least $1.3 million in discounts, rebates and incentives.[4] *Id.* at i.

### E.   Relator's allegations

Relator filed his Complaint on October 30, 2003. He alleged that, since 1993, Defendants have failed to credit SFAs with rebates, discounts and allowances they received from food manufacturers and national distributors, thereby causing SFAs to falsely certify compliance with applicable federal regulations that prohibit SFAs from paying costs that are not net of rebates. He also asserted that, by including provisions in their cost reimbursable contracts allowing them to keep such rebates, Defendants breached the requirements of OMB Circular A-87 and that their contracts were, in essence, "cost-plus-a-percentage-of-cost" contracts, which are prohibited by federal regulations. *See* 7 C.F.R. § 210.16(c).

The United States moved to extend the seal on this action several times to investigate Relator's allegations. *See* 31 U.S.C. § 3730(b)(3). In March 2005, however, the United States opted not to intervene. The Court subsequently extended the seal, on Relator's request, while Relator

---

[4] Although the December 2005 audit did not expressly name Chartwells, it references a March 2002 audit of Chartwells, noting that two audits investigated the same FSMC. December 2005 Audit at 4 n.10; Great Plains Region Audit, OIG, USDA, Report No. 2760-13-KC, *Food and Nutrition Service National School Lunch Program Chartwells Food Service Management Company* (Mar. 2002) [hereinafter March Chartwells Audit].

retained counsel; the seal was again extended once new counsel was retained so that Relator could amend his Complaint.

On August 31, 2007, Relator filed an Amended Complaint. As in his initial Complaint, Relator accused Defendants of causing SFAs to falsely certify compliance with federal regulations by failing to credit SFAs with rebates, discounts and allowances that Defendants received from food manufacturers and national distributors. For the first time, Relator also alleged that Defendants' use of national distributors (who gave them rebates), instead of seeking competitive bids from local distributors (who charge less for the same goods), caused SFAs to falsely certify compliance with federal procurement regulations requiring procurement in a manner "providing full and open competition." *See* 7 C.F.R. § 3016.36(c). The fifty-three-page Amended Complaint quotes extensively from several of Defendants' contracts with SFAs and from RFPs issued by those SFAs, and identifies specific invoices that Relator alleges will prove his theory. The Amended Complaint baldly asserts that it "is not based on any public disclosure of information" and that to the extent any of his allegations have been publicly disclosed, "Relator has direct and independent knowledge of the information on which the allegations are based." (Am. Compl. ¶ 7.)

The Court extended the seal for another sixty days to permit the Government to assess the allegations of the Amended Complaint. The Government did not seek to intervene nor to extend the seal. Accordingly, the Court lifted the seal so that Plaintiff could serve the Defendants. After Defendants were served, they filed the instant motions to dismiss, predominately arguing that the FCA's jurisdictional bar, 31 U.S.C. § 3730(e)(4), divests this Court of jurisdiction and that Plaintiff has failed to state a claim because the regulations upon which he relies do not apply to FSMCs.

## II.    STANDARDS OF REVIEW

Challenges to subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), may be facial or factual.  *Medina v. City of Phila.*, Civ. A. No. 04-5698, 2005 WL 1124178, at *2 (E.D. Pa. May 9, 2005) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)), *aff'd*, 219 Fed. Appx. 169 (3d Cir. 2007).  "In a facial attack, a defendant argues that the plaintiff did not properly plead jurisdiction . . . [whereas] a 'factual' attack asserts that jurisdiction is lacking on the basis of facts outside of the pleadings."  *Smolow v. Hafer*, 353 F. Supp. 2d 561, 566 (E.D. Pa. 2005).  When a defendant brings a factual attack, as Defendants do here, the Court may consider matters outside the pleadings when determining its jurisdiction.  *See United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007) (concluding that challenge to jurisdiction pursuant to Section 3730(e)(4) is factual).  A relator "bears the burden of alleging facts essential to show jurisdiction under the False Claims Act as well as supporting those allegations with competent proof."  *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1048 (10th Cir. 2004) (internal quotations omitted).

A court reviewing a motion to dismiss, pursuant to Rule 12(b)(6), should accept the complaint's allegations as true, read those allegations in the light most favorable to the plaintiff, and determine whether a reasonable reading indicates that relief may be warranted.  *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).  Although the federal rules impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2007); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007) ("Factual allegations [in a complaint] must

11

be enough to raise a right to relief above the speculative level.").  Simply reciting the elements will

not suffice.  *Phillips*, 515 F.3d at 231.  When faced with a motion to dismiss for failure to state a

claim, courts may consider the allegations in the complaint, exhibits attached to the complaint,

matters of public record, and documents that form the basis of a claim.  *Lum v. Bank of Am.*, 361

F.3d 217, 222 n.3 (3d Cir. 2004).  Additionally, a court may consider "court files, records, and letters

of official actions or decisions of government agencies and administrative bodies when considering

a Rule 12(b)(6) motion."  *Fed. Elec. Comm'n v. Arlen Specter '96*, 150 F. Supp. 2d 797, 803 n.5

(E.D. Pa. 2001) (internal quotations omitted).

## III.    DISCUSSION

### A.    The Court Lacks Jurisdiction Over Relator's Rebate-Related Allegations

Before bringing a claim under the FCA, a relator must give the Government the option to

intervene and take over the action.  31 U.S.C. § 3730(b) (2008).  If the Government declines to

intervene, a relator may proceed subject to the FCA's jurisdictional bar, 31 U.S.C. § 3730(e)(4).

That provision divests a district court of jurisdiction when: "(1) there was a 'public disclosure'; (2)

'in a criminal, civil, or administrative hearing, in a congressional, administrative or [General]

Accounting Office report, hearing, audit, or investigation, or from the news media'; (3) of

'allegations or transactions' of the fraud; (4) that the relator's action was 'based upon'; and (5) the

relator was not an 'original source' of the information."  *United States ex. rel. Pranich v. Sorgnard*,

396 F.3d 326, 332 (3d Cir. 2005).

> *1.    Relator's rebate-related allegations are based upon publicly disclosed allegations or transactions, but his procurement-related allegations are not*

The first inquiry in the jurisdictional analysis is whether Plaintiff's claim "is based on publicly disclosed allegations or transactions." *Atkinson*, 473 F.3d at 519.  This inquiry proceeds in two steps.  The Court initially determines "whether the information was disclosed via one of the sources listed in § 3730(e)(4)(A)" and subsequently determines "whether the relator's complaint is based on those disclosures." *Id.*; *see also United States ex rel. Dunleavy*, 123 F.3d 734, 744 (3d Cir. 1997).  "An 'allegation' of fraud is 'a conclusory statement implying the existence of provable supporting facts,'" while a "fraudulent 'transaction' . . . is one that discloses the 'critical elements' of fraud." *United States ex rel. Waris v. Staff Builders, Inc.*, Civ. A. No. 96-1969, 1999 WL 788766 (E.D. Pa. Oct. 4, 1999) (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653-54 (D.C. Cir. 1994)).  A relator's allegations are "based upon" public disclosures for purposes of the jurisdictional bar if they are "supported by" or "substantially similar to" publicly disclosed allegations or transactions, even if they are not actually derived from those disclosures. *Pranich*, 396 F.3d at 334.

The Third Circuit uses an algebraic formula to determine when publicly disclosed information triggers the jurisdictional bar:

> [I]f $X + Y = Z$, Z represents the allegation of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

*Dunleavy*, 123 F.3d at 741 (quoting *Springfield Terminal*, 14 F.3d at 654 (alteration in original).  The X in this formula represents the misrepresented state of facts, the Y represents the true state of facts and the Z represents the alleged fraud.  *Id.*  Accordingly, "if either Z (fraud) or both X (misrepresented facts) and Y (true facts) are disclosed by way of a listed source, then a relator is

barred from bringing suit under § 3730(e)(4)(A) unless he is an original source." *Atkinson*, 473 F.3d at 519; *see also United States ex rel. Mistick v. Housing Auth. of Pittsburgh*, 186 F.3d 376, 388 (3d Cir. 1999) ("hold[ing] that a qui tam action is 'based upon' a qualifying disclosure if the disclosure sets out either the allegations advanced in the qui tam action or all of the essential elements of the qui tam action's claims").

Defendants argue that Relator's allegations were publicly disclosed by several OIG audits that investigated FSMCs' retention of rebates and concluded that FSMCs were retaining rebates instead of passing them through to SFAs.  Mainly, Defendants rely on the April 2002 audit which disclosed that FSMCs were retaining rebates by amending, deleting or ignoring contrary RFP terms, thereby circumventing the principles of OMB Circular A-87.  Additionally, Sodexo and Aramark point out that GAO was aware of this common industry practice as early as 1996.

Relator concedes that the Government, as revealed by the several audits on the subject, was well aware that FSMCs were retaining rebates.  (Relator's Mem. of Law in Opp'n to Defs.' Mots. to Dismiss [hereinafter "Relator's Opp'n"] at 12.)  The GAO and OIG audits clearly represent Section 3730(e)(4) sources capable of publicly disclosing Relator's allegations disclosures.  *See* 31 U.S.C. § 3730(e)(4) (listing "congressional, administrative or [General] Accounting Office report[s], hearing[s], audit[s], or investigation[s]" as sources that, if they disclose a relator's allegations of fraud, could bar a *qui tam* action); *Dunleavy*, 123 F.3d at 745 (administrative reports in the context of Section 3730(e)(4) refer to "administrative reports that originate with the federal government").  Nonetheless, Relator asserts that none of the sources identified by Defendants disclose his allegations, because they do not disclose that Defendants were causing the submission of false claims.  In this vein, Relator argues that the audits' publication of the *information* that FSMCs were

14

retaining rebates does not disclose the *allegation* that FSMCs, by retaining rebates, were causing SFAs to file false claims.

Although there exists a distinction between public information and publicly disclosed allegations, *see Dunleavy*, 123 F.3d at 740, Relator's argument fails because the April 2002 audit publicizes the critical elements of the fraud alleged in this case.  The April 2002 audit investigated eight management companies, operating in seven states, for purposes of "determin[ing] whether sufficient controls exist[ed] to ensure that (1) food service management companies credit SFA's for the full value of . . . purchase discounts and rebate[s] as applicable; and (2) that management companies and SFA's administered the NSLP in accordance with applicable laws, regulations, and FNS guidelines." (April 2002 Audit at 2).  The audit described its findings as to FSMCs using cost-reimbursable contracts as follows:

> Two management companies that maintained cost-reimbursable contracts nationwide profited at the expense of 7 of the 19 SFA's we reviewed by retaining over $280,000 in discounts and rebates they received on purchases made for their food service operations.  To accomplish this, the management companies amended, eliminated, or ignored terms included in the requests for proposal issued by the SFA's.

*Id.* at ii.  Not only does the audit reveal that FSMCs were retaining rebates instead of passing them through to SFAs, but it describes the exact theory of fraud identified by Relator in his Amended Complaint — that FSMCs were editing out, replacing or ignoring RFP terms that would have required them to pass through rebates so that they could, instead, retain rebates in violation of Federal regulations.  *Compare id.* at 11 ("The management companies were able to retain these benefits by amending, eliminating, or ignoring terms included in the RFP's issued by the SFA's that would have required them to pass through any discounts or rebates for purchases made on the SFA's behalf."); *id.* at 5 (finding that some FSMCs "insert[ed] contract provisions that were contrary to

15

Federal regulations . . . which essentially allowed management companies to retain benefits that should have accrued to the SFAs' food service programs") *with* (Am. Compl. ¶ 26 ("[A]lthough Federal regulations required SFAs' purchases to be net of all rebates, discounts and allowances and Requests for Proposal ("RFPs") issued by SFAs and received and reviewed by Defendants made this clear, Defendants later excluded this language from their contracts and instead inserted provisions permitting Defendants to retain rebates, discounts and allowances received from national distributors and food manufacturers.").)   These findings were further broadcast by a news article (a Section 3730(e)(4)(A) enumerated source) reporting on the audit.  *See USDA Report Contractors Skimmed Millions From Lax Education Clients, supra*.

Accordingly, the critical elements of Relator's allegations, indeed, the fraud itself, were public long before Relator filed suit.  That the report is silent on false certifications is irrelevant because Relator's allegations need only be substantially similar, not identical, to those disclosed publicly.  The meat and potatoes of the fraud — retention of rebates despite regulations requiring those rebates to be passed through to the SFAs — was revealed by the April 2002 audit.  Relator merely molds this publicly disclosed regulatory violation into a false certification theory so as to state a claim under the FCA and then argues that the audit does not disclose his allegations because it is not phrased in the manner articulated in his Amended Complaint.  Relator cannot circumvent the FCA's jurisdictional bar in such a manner.  *See United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 572 (10th Cir. 1995) (rejecting relator's argument that GAO report identifying industry practice and corresponding possible regulatory violation did not publicly disclose allegation because report did not identify FCA violation); *see also United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 688 (D.C. Cir. 1997) ("A relator's ability to recognize the legal

consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed."). Indeed, the FCA's jurisdictional bar would be rendered meaningless if a relator could bypass public disclosures through the semantic legerdemain of recasting disclosed regulatory violations in false claims language.

Furthermore, this case is distinguishable from *Dunleavy*, on which Relator relies. In that case, Dunleavy, a former consultant to Delaware County, sued the County for violations of the FCA. The County, which used Department of Housing and Urban Development ("HUD") funds to acquire certain land for purposes of constructing a highway, was required to abide by HUD regulations governing permissible uses of the money. The County sold some of the land, but neither disclosed the sale proceeds in a Grantee Performance Report submitted to HUD nor returned the sales proceeds to HUD. The Third Circuit concluded that newspaper articles, a pretrial memorandum in an unrelated litigation and certain financial audits did not disclose the relator's allegations. Although these sources disclosed the county's receipt of the sale proceeds and obligation to repay those proceeds to the Federal Government (the actual facts), they did not disclose the County's failure to report to the Federal Government that the proceeds were in the County's possession (the misrepresented facts). In contrast, a grantee performance report prepared by the county and submitted to HUD during the year in which the county would have been obligated to repay the funds did disclose the County's failure to repay, as those funds were omitted. However, because this report did not qualify as an enumerated source under Section 3730(e)(4), it did not preclude Dunleavy from pursuing his claim.

Unlike *Dunleavy*, in which the County's actual failure to pay the proceeds back to the federal government was not disclosed by an enumerated source, the critical elements of Relator's allegations

17

in this case are all revealed by the OIG audit, a Section 3730(e)(4) enumerated source.  The audit discloses that: (1) RFP terms and federal regulations obligated FSMCs to pass rebates through to SFAs; (2) Defendants adopted contract terms expressly allowing them to retain rebates or ignored RFP terms to the contrary; and (3) Defendants actually retained rebates, consequently violating the regulations' prohibitions.  There is no piece of the puzzle in this case that has not been publicly disclosed by an enumerated source.

Relator's next argument is that the public disclosures identified by Defendants cannot trigger the FCA's jurisdictional bar because they failed to specifically identify Defendants as among the FSMCs who engaged in the offending practices.  Contrary to Relator's assertion, public disclosures of industry-wide fraud may bar *qui tam* actions against the defendants who engaged in those fraudulent practices even though the disclosures do not specifically identify those engaged in the fraud.  In *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997), the relators alleged that government employees' clubs earning revenue from vending services on federal property violated the FCA by retaining money owed to the government and using that money for social events.   The D.C. Circuit rejected the relators' argument that they were blowing the whistle on specific fraud despite public disclosures identifying general fraud and concluded that the FCA's jurisdictional bar applied.  The court explained that "[e]ach of the public disclosures [considered by the Court] raise[d] the specter of 'foul play' by acknowledging the questionable legality of permitting federal employees to use federal facilities for the provision of vending services and retaining revenue from such services."  *Id.* at 688.  Accordingly, even though none of the disclosures specifically referenced the defendants, those actors potentially engaged in the questionable practice had in essence been identified given the public disclosures.  Since the relators'

complaint merely "repeat[ed] what the public already knows and add[ed] only the identity of particular employees' clubs engaged in the questionable and previously documented generic practice," his claims were based upon publicly disclosed transactions. *See also United States ex rel Gear v. Emergency Med. Assocs. of Illinois, Inc.*, 436 F.3d 726, 729 (7th Cir. 2006) ("We are unpersuaded by an argument that for there to be public disclosure, the specific defendants named in the lawsuit must have been identified in the public records."); *Fine*, 70 F.3d 568, 571 (10th Cir. 1995) (GAO report that disclosed questionable practice among laboratories contracting with Department of Energy and subsequent congressional hearing barred *qui tam* action even though defendant not specifically mentioned because disclosures "set the government squarely on the trail of the alleged fraud without [relator's] assistance, [and thus] it would be contrary to the purposes of the FCA to exercise jurisdiction over his claim").

In contrast, the Eleventh Circuit in *United States ex rel. Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir. 1994), found that jurisdiction existed over a relator's claims despite public disclosures of general, industry-wide fraud. The relator was a "working aged," who, by virtue of his age and federal employment, qualified for both Medicare benefits and the Federal Employees Health Benefits Program, which was administered by the defendant. Medicare Secondary Payer ("MSP") laws required the defendant to pay the relator's medical bills before sending them to Medicare. However, when the relator submitted a claim to the defendant, the defendant would instruct him to first submit the claim to Medicare. Accordingly, the relator brought a *qui tam* action alleging that defendant committed Medicare Secondary fraud. The defendant invoked the jurisdictional bar and identified five potential disclosures, many of which revealed MSP fraud throughout the insurance industry, but did not specifically identify the defendant. The Eleventh

19

Circuit held that "[t]he allegations of widespread MSP fraud made in sources in which [defendant] was not specifically named or otherwise directly identified [were] insufficient to trigger the jurisdictional bar." *Id.* at 566.  The decision was motivated by the concern that the Government often "has difficulty identifying all of the individual actors engaged in [general] fraudulent activity." *Id.* at 566; *see also United States ex rel. Friedman v. Rite Aid Corp.*, 152 F. Supp. 2d 766, 769-70 (E.D. Pa. 2001) (*qui tam* action against Rite Aid for submitting false statement to government for sale of prescription drugs was not based on newspaper articles about large pharmacies engaged in the practice where none of the articles specifically mentioned Rite Aid).

These cases establish that when minimal effort is required to determine specific perpetrators from public disclosures of general fraud, or when the disclosed fraud could only be attributed to an ascertainable number of possible perpetrators, jurisdiction will not lie.  In contrast, when the fraud occurs on a transactional level and individual perpetrators are difficult to discern, the FCA's jurisdictional bar is not triggered.  These rules further the jurisdictional bar's dual purposes of encouraging putative relators to file suits that the Government is incapable of bringing on its own while preventing parasitic suits that merely identify obvious perpetrators of generic fraud that has already been publicized.

Here, public disclosures revealed that FSMCs nationwide were altering RFP terms in order to retain rebates.  It would be relatively easy for anyone, including the Government, to discern which FSMCs engaged in this practice merely by looking at their contracts with SFAs and comparing them to the RFPs.  Indeed, this appears to be exactly what Relator did in constructing his Amended Complaint.  Furthermore, it is clear from the April 2002 audit that the Government was already aware that FSMCs were ignoring contract terms requiring the pass through of rebates and was

therefore conducting investigations of FSMCs, including Chartwells.[5]  *See* December 2005 Audit.

Furthermore, the 1996 GAO report, which first observed that some FSMCs used contract terms to

enable their retention of rebates, specifically mentioned Marriott, Sodexo's predecessor, and

Aramark as large FSMCs that typically contract with school districts.  *GAO Report, School Lunch*

*Program: Role and Impacts of Private Food Service Companies* 16.  Relator himself acknowledges

that Defendants are responsible for "45% or more of the FSMC-managed SFAs."  (Compl. ¶ 18.)

Accordingly, Defendants are not obscure companies engaged in minor level transactions, but are

instead major players in the food service industry either already identified or easily identifiable as

entities potentially involved in the publicly disclosed industry-wide scheme.  Given the extent of the

Government's investigation into FSMC rebate retention and the relative ease in identifying

Defendants' involvement in the practice, Relator's identification of Defendants as perpetrators of

the fraudulent behavior does not relieve his allegations from being based on public disclosures.

    Although Relator's allegations of fraudulently-retained rebates have long been publicly

exposed, Defendants have failed to identify any public disclosure of Relator's allegation that

Defendants violated federal procurement regulations by failing to purchase food and related items

in a manner that effectuates full and open competition.  Sodexo points to a February 2002 audit and

a July 2003 audit, which investigated cooperative buying groups (groups of SFAs joining together

---

[5] The allegation that certain Defendants retained rebates despite contrary contract terms appeared for the first time in Relator's Amended Complaint.  His initial Complaint alleges only that Sodexo and Aramark retained rebates per explicit contract terms and that Chartwells's contracts were silent on the subject of rebates.  (Compl. ¶ 3.)  Accordingly, the December 2005 audit may be considered by the Court as to this particular allegation.  *See United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 255 F. Supp. 2d 351, 367 n.15 (2002) ("[T]he court must be concerned with whether the public disclosure of a given allegation predated the appearance of that allegation in [a relator's] complaint, *not* . . . whether the public disclosure antedated the inception of [the] action.").

to acquire the purchasing power of a large organization) and concluded that they did not always comply with competitive bidding regulations.   Southeast Region Audit, OIG, USDA,  Report No. 27101-3-At, *Food and Nutrition Service National Lunch Program Procurement Process Southeast Region* i (Feb. 2002); Great Plains Region Audit, OIG, USDA,  Report No. 27010-10-KC, *Food and Nutrition Service National School Lunch Program Unified School District 248 Girard, Kansas* 2 (July 2003) [hereinafter "July 2003 Audit"].  Sodexo asserts that Relator's procurement-related allegations were disclosed because, "[w]hile the [July 2003 audit] addressed a situation involving a purchasing cooperative as opposed to a FSMC, the report specifically compared the cooperative to a FSMC."  (Sodexo's Mem. at 18.)

Sodexo's argument fails.  The July 2003 audit, which reported that the cooperative solicited bids directly from current suppliers instead of advertising for bids per relevant regulations, only referenced FSMCs in two sentences:

> We did not note any specific SA requirements that purchasing cooperatives had to follow similar to those agreements with food service management companies (FSMC).  In contrast, the SA had specified that required provisions be included in contracts between SFA's and FSMC's . . . .  We believe there needs to be a written agreement between SFA's and cooperatives covering all Federal and State requirements.

July 2003 Audit at 6.  This notation illustrates that SFA's agreements with cooperatives, *unlike* those with FSMCs, lacked terms concerning federal regulations.  Clearly then, this audit cannot be extrapolated to cover Relator's allegations as to FSMCs.

Chartwells argues that Relator's procurement allegations have been disclosed because "[w]hile the OIG audit reports do not specifically discuss whether FSMCs submitted bids to local or national distributors, Relator's allegations are simply a sub-species of its allegation that

22

Chartwells and other FSMCs were fleecing NSLP and SBP by retaining valuable discounts and rebates from national distributors."  (Chartwells's Mem. at 15 n.11.)  Relator's allegations as to procurement are distinct from his allegations regarding rebates — the two theories rely on different conduct and different regulations.  Since none of the audits disclose that Defendants, by procuring goods from their national suppliers, were failing to abide by regulations requiring open and full competition, this allegation survives the FCA's jurisdictional bar.

Accordingly, this court has jurisdiction over those allegations pertaining to Defendants' failure to operate in compliance with federal procurement regulations, which were not publicly disclosed in an enumerated source.[6]   However, whether jurisdiction exists over Relator's rebate-related claims, which were publicly disclosed by enumerated sources, depends on whether Relator qualifies as an original source of his allegations.

> 2.      *Relator is not an original source*

When a relator's allegations are based upon publicly disclosed allegations or fraudulent transactions, his FCA claim is barred unless the relator qualifies as an original source.  "'Original

---

[6] In his memorandum of law in opposition to Defendants' motions to dismiss, Relator asserts another procurement-related theory, despite having failed to plead it in his fifty-three page Amended Complaint.  Quoting from FNS's December 2004 notice of proposed rulemaking, Relator asserts that Defendants caused SFAs to falsely certify compliance with procurement regulations by altering RFP terms to retain rebates, which compromises the procurement process. *See* 69 Fed. Reg. at 78342 ("[W]hen a school food authority agrees to or allows a winning bidder to make changes to contract terms that are materially inconsistent with the underlying solicitation document, the [SFA] has subverted full and open competition by denying all bidders the opportunity to compete under the same terms and conditions.").  The Court need not entertain this theory since it is not plead in Relator's Amended Complaint.  However, the fact that the theory initially appears in Relator's opposition to Defendants' motions as a direct quote from the Federal Register illustrates that Relator plucked it directly from the public domain and is thus, barred by Section 3730(e)(4) from asserting it. *See Atkinson*, 473 F.3d at 522 ("[R]eliance solely on 'public disclosures' under § 3730(e)(4)(A) is *always* insufficient under § 3730(e)(4)(B) to confer original source status.").

source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action . . . which is based on the information." 31 U.S.C. § 3730(e)(4)(B); *Pranich*, 396 F.3d at 335. "Direct knowledge is knowledge obtained without any intervening agency, instrumentality or influence: immediate," while "[i]ndependent knowledge is knowledge that does not depend on public disclosures." *Atkinson*, 473 F.3d at 520 (internal quotations omitted). A relator he cannot establish that he is an original source solely by relying on "unsupported, conclusory allegation[s]." *Kennard*, 363 F.3d at 1044. In assessing Relator's original source status, the Court must examine the allegations contained in the Amended Complaint. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007).

In *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, 473 F.3d 506 (3d Cir. 2007), the Third Circuit addressed when a relator who relies on information that is public, but which is not publicized by an enumerated source, qualifies as an original source. Atkinson, the relator, alleged that Sun Ship and its successor Penn Ship conspired to and did defraud the United States Navy in connection with a contract to build oil tankers. The fact that Penn Ship failed to record the Navy's security interest in certain of Penn Ship's property had been publicly disclosed by virtue of the relator's FOIA request and a Department of Defense Office of the Inspector General Audit Report. At issue was whether Atkinson was an original source of this fact, which he learned from county records, a non-enumerated source.

The Third Circuit, relying on the Tenth Circuit's analysis in *Kennard v. Comstock Resources, Inc.*, 363 F.3d 1039, 1046 (10th Cir. 2004), explained that when a relator's knowledge of fraud is based on information that is public, but which was not disclosed by an enumerated source, "courts

should consider both 'the availability of the information and the amount of labor and deduction required to bring the claim.'" *Atkinson*, 473 F.3d at 522 (quoting *Kennard*, 363 F.3d at 1046).   A relator who discovers fraudulent conduct from obscure records and whose considerable investigative efforts reveal a previously undisclosed fraud may qualify as an original source, whereas a relator who merely compiles public documents will be barred.  This case-by-case approach is more likely to "fulfill the FCA's 'twin goals of rejecting suits which the government is capable or pursuing itself, while promoting those which the government is not equipped to bring on its own.'" *Id.* (quoting *Springfield Terminal*, 14 F.3d at 651).  Although a non-insider relying on public documents can qualify as an original source, the Third Circuit cautioned that "courts must be mindful of suits based only on 'secondhand information, speculation, background information or collateral research . . . .'" *Id.* at 523 (quoting *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162-63 (10th Cir. 1999)).

Applying these principles to Atkinson's case, the Third Circuit held that Atkinson did not qualify as an original source because anyone could have gone to the county recording office to see if defendants recorded their interest in accordance with the contract:

> [Relator's] research did not involve 'obscure' public records, nor were the public records only a small part of the information ultimately uncovered by his investigation.  Indeed, it was *only* from review of information in the public domain that Atkinson learned of the failure to record.  . . . [T]he availability of the information was high and the amount of deduction was minimal.  It takes little sophistication to conduct a survey of a filing; anyone interested in knowing whether Penn Ship recorded the instruments listed in the Trust Indenture could do so.  Moreover, extrapolating from the absence of a recording to the fact that the instruments were not recorded does not require much interpretive rigor.

*Atkinson*, 473 F.3d at 524.

Relator's initial Complaint alleges that he questioned the value of lunches served in the

25

public schools in his district, which led him to conduct "an in-depth study that caused him to conclude that his SFA was paying its FSMC, Sodexho, for food products and supplies, amounts that far exceeded Sodexho's net cost of procuring such goods, in violation of federal law." (Compl. ¶ 15.)  From there, Relator allegedly initiated "a large scale investigation, wherein he interviewed approximately 50 individuals with first-hand knowledge of the [Complaint's] allegations" and "extensively analyzed financial reports and statements and reviewed dozens of FSMC contracts and hundreds of pages of other relevant material." (*Id.* ¶ 16.)  The Amended Complaint provides no details of Relator's investigative efforts, but baldly asserts that his allegations are "not based upon any public disclosure" and that "Relator has direct and independent knowledge of the information on which the allegations are based." (Am. Compl. ¶ 7.)

Accordingly, Relator claims that he is an original source of the allegations in his Amended Complaint because his knowledge of the "most critical elements" of his claims is "a result of an extensive, independent review of contracts, RFPs, invoices, Claims for Reimbursement, and discussions with school district personnel over the course of several years." (Relator's Opp'n at 23.) Assuming as the Court must, that Relator's knowledge of his allegations stems solely from public documents that do not constitute enumerated sources and interviews with (undisclosed) school district personnel, even though it is unlikely that he never came across OIG's audits in the course of his investigation, he proffers no details in support of his assertions.  Indeed, the jurisdictional allegations in the Amended Complaint, the governing document in this case, are nothing but conclusory assertions that track the language of the FCA's jurisdictional bar.  Although this alone would be fatal to Relator's claim, even taking Relator's self-described "extensive" investigation into account, he still does not qualify as an original source.

Relator relies heavily on *Kennard v. Comstock Resources, Inc.*, 363 F.3d 1039 (10th Cir. 2004), which the Third Circuit cited favorably in *Atkinson*. In that case, relators Kennard and Wright brought a *qui tam* action alleging that the defendant violated the FCA by underpaying an Indian Tribe on oil and gas leases regulated by the Secretary of the Interior. Wright owned royalty interests in a tract of land near the Tribe's reservation and realized that his royalty payments drastically decreased after the defendant acquired a lease to that land. Wright informed Kennard of his realization and Kennard subsequently undertook an investigation. Based on a review of public records and using their oil and gas experience, the relators learned that the defendant was underpaying the Tribe and was aware of its underpayments. The relators had their attorneys draft a *qui tam* complaint and invited the Tribe to join in the action. However, the Tribe sued on its own behalf, thereby disclosing the relators' allegations in its complaint.

Despite this public disclosure, the Tenth Circuit held that jurisdiction existed over the relators' claims because the relators qualified as original sources. The court announced the principle that, where a relator relies on public information in support of his allegation, courts must assess the "degree and character" of the relator's reliance. *Id.* at 1045. The court concluded that the relators were original sources because they "did not merely label or translate an already publicly disclosed fraud," but instead, conducted their own investigation to discover a fraud of which the Government was unaware. *Id.* at 1046. The court emphasized that the Tribe's case would not have existed but for the relators' efforts. *Id.* at 1047 ("Through discovery and deduction, Relators ferreted out the alleged fraud in this case and must, therefore, qualify as an original source.").

This case is easily distinguishable from *Kennard*. In *Kennard*, the Government would have been wholly unaware of the defendant's fraudulent conduct absent the relators' efforts, whereas here

27

the Government had already conducted several audits documenting FSMCs' retention of rebates and was planning regulatory action to address the problem. In *Kennard*, the relators analyzed obscure documents to discover a fraud, whereas Relator's investigation in this case consisted of compiling easily accessible public documents in order to support allegations of a fraud that had already been publicly disclosed. Furthermore, it takes little deduction to conclude that FSMCs are retaining rebates when their publicly available contracts *expressly provide* that they will, in fact, retain rebates. Although Relator also alleges that certain Defendants failed to pass through rebates when their contracts were silent on the issue or despite contrary contract terms, which is harder to establish, these allegations were also already publicly exposed. (*See* April 2002 audit at ii ("[T]he management companies amended, eliminated, or ignored terms included in the requests for proposal issued by the SFA's.").) Since this is a case that the Government was capable of pursuing on its own and which is based exclusively on Relator's review of public records and second hand information, both *Kennard* and *Atkinson* caution against jurisdiction. Accordingly, this Court lacks jurisdiction over Relator's rebate-related allegations because he is not an original source of those allegations.

**B.    Relator's Claims Fail Because He Cannot Establish a Regulatory Violation**

Even if this Court possessed jurisdiction over Relator's rebate-related allegations, his claims fail, as do his procurement-related allegations. Relator alleges that Defendants caused false or fraudulent claims to be presented to the United States for payment, in violation of 31 U.S.C. § 3729(a)(1), and that Defendants caused a false record or statement to be made for purposes of securing payment from the United States government, in violation of 31 U.S.C. § 3729(a)(2). "To establish a *prima facie* case under 31 U.S.C. § 3729(a)(1) of the FCA, the relator must prove, '(1)

the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.'" *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004) (quoting *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001)). "In order to prove a claim under § 3729(a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." *Id.* For liability to attach under either theory the claim must, in fact, be false.

Even if jurisdiction existed over Relator's rebate-related claims, dismissal would be warranted because he cannot establish that the claims submitted by SAs and SFAs were false or fraudulent. FNS explicitly took the position that the federal cost principles in OMB Circular A-87 *did not apply* to cost-reimbursable contracts between FSMCs and SFAs. (*See* Nov. 26, 2002 Management Alert; Dec. 17, 2002 Rankin Memo; Jan. 15, 2003 Memo; May 20, 2003 Letter from Dir. of Child Nutrition Div.; July 9, 2004 Letter from Dir. of Child Nutrition Div.) FNS's position was that NSLP and SBP regulations did not require FSMCs to bill SFAs net of applicable rebates, discounts, or any other purchase incentives. Thus, irrespective of the plausibility of Relator's reading of the relevant regulations to require FSMCs to pass through rebates, Defendants cannot be liable because FNS, the federal agency administering the NSLP and SBP, took the position that those regulations did not apply to Defendants' contracts.[7] *See United States ex rel. Quinn v. Onmicare,*

---

[7] Relator may not bypass FNS's several memoranda disavowing OMB Circular A-87's applicability to FSMC's cost-reimbursable contracts by asserting that they are ambiguous and, thus, create a material issue of fact. (*See* Relator's Opp'n at 26-29.) All of the documents clearly establish that FNS's position, after discussing the issue with OMB, was that Circular A-87's requirements did not require FSMCs to pass through rebates to SFAs. No reasonable person could conclude otherwise. Moreover, even if FNS's directives were "ambiguous," Relator's rebate-related claims still fail because an ambiguous regulatory interpretation that reasonably

*Inc.*, 382 F.3d 432, 438 (3d Cir. 2004) (affirming summary judgment on claim that defendant violated the FCA by failing to adjust claims for Medicaid reimbursement because "if there is no requirement to adjust the claim, there is no liability for a failure to do so"); John T. Boese, *Civil False Claims and Qui Tam Actions* (3d ed. 2006) § 2.03[G][2] at 2-160 ("Before FCA liability may be imposed because of allegedly false certifications of compliance with an underlying statute, regulation, or contract, the plaintiff in an FCA case must prove that the alleged violation actually did occur.").

Although FNS did not proclaim OMB Circular A-87's inapplicability to cost-reimbursable contracts until late 2002, the Circular's application to SFA's contracts with FSMCs prior to that point was not as obvious as Relator asserts.  On their face, the procurement regulations that incorporated OMB Circular A-87 did not apply to FSMCs.  Prior to November 2007, regulations governing the NSLP stated that "*State Agencies* and *school food authorities* shall comply with the requirements of 7 CFR part 3016 or 7 CFR part 3019, as applicable, concerning the procurement of supplies, food, equipment and other services with Program funds."[8]  7 C.F.R. § 210.21 (2007) (emphasis added); *see also id*. § 220.16 (same for SBP).  Regulations at Part 3016 pertaining to

---

could be read to authorize Defendants' conduct precludes a finding that Defendants knowingly submitted a false claim.  *See United States ex rel. K&R Ltd. P'ship v. Mass. Housing Fin. Agency*, 530 F.3d 980 (D.C. Cir. 2008) (affirming summary judgment on relator's FCA claim where allegation of fraud depended on interpretation of ambiguous mortgage note and both parties' interpretations were plausible).

[8] The 2007 amendments to these regulations changed the language to incorporate OMB Circulars: "State agencies and school food authorities shall comply with the requirements of this part and 7 CFR Part 3016 or 7 CFR Part 3019, as applicable, which implement the applicable [OMB] Circulars, concerning the procurement of all goods and services with non-profit school food service account funds."  72 Fed. Reg. at 61491 (codified at 7 C.F.R. § 210.21(a)); *see also id.* at 61494 (codified at 7 C.F.R. § 220.16(a)).

financial administration dictate that grantees and subgrantees of federal funds may only pay allowable costs and incorporates OMB Circular A-87 for guidance regarding which costs are allowable.  *Id.* § 3016.22.  "Grantee" is defined as "the government to which a grant is awarded and which is accountable for the use of the funds provided" (here, the SAs) and  "subgrantee" is defined as "the government or other legal entity to which a subgrant is awarded and which is accountable to the grantee for use of the funds provided" (here, the SFAs).  7 C.F.R. § 3016.3.

Since the regulations do not expressly apply to anyone other than SAs and SFAs, there is at least a reasonable basis for the position that the Circular's cost principles did not apply in cases of cost-reimbursable contracts with FSMCs.  The reasonableness of this position is illustrated by FNS's change in position, and OMB and OIG's differing opinions.  Indeed, if the regulations clearly prohibited FSMCs from retaining rebates in the first place, there would have been no need to amend them to prohibit SFAs from using nonprofit school food service account funds to reimburse FSMCs for claims in excess of the FSMCs' actual costs.  *See* 7 C.F.R. § 210.21(f)(2).  The lack of clarity regarding the proper interpretation of the regulations indicates that no basis exists for imposing FCA liability on Defendants, who merely adopted a reasonable interpretation of regulatory requirements which favored their interests.[9]  *See United States v. Medica Rents Co., Ltd.*, Appeal Nos. 03-11297, 06-10393, 07-10414, 2008 WL 3876307, at *3 (5th Cir. 2008) (when authorities responsible for advising as to Medicare coding determinations created "substantial confusion" by giving defendant contradictory advice as to the proper medicare code for defendant's product, summary judgment was warranted on FCA claim); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018

---

[9]  Moreover, it is unclear how Relator could prove any fraudulent misrepresentation by virtue of Defendants' retention of rebates in those instances when clear contract terms expressly permitted them to do so.

(7th Cir. 1999) ("[I]mprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA."); *cf. Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 127 S.Ct. 2201, 2216 n.20 (2007) (noting, in the context of the Fair Credit Reporting Act, that "[w]here . . . the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator").

Relator's allegations that Defendants' failure to procure goods in a manner consistent with federal regulations caused local and state entities to file false certifications also fail. As noted above, these regulations apply solely to SAs and SFAs and not to FSMCs. The regulations at Part 3016 requiring "[a]ll procurement transaction [to] be conducted in a manner providing for full and open competition" apply only to "grantees" and "subgrantees" of federal funds — SAs and SFAs. 7 C.F.R. § 3016.36(c). The regulations pertaining to SFA's use of FSMCs clearly indicate that FSMCs were not required to procure food and other items in compliance with this, or other, procurement regulations at Part 3016. These regulations require "[a]ny *school food authority* that employs a food service management company in the operation of its nonprofit school food service" to "[a]dhere to the procurement standards specified in § 210.21 [which directs compliance with Part 3016] *when contracting with the food service management company.*" *Id.* § 210.16(a)(1) (emphasis added). This clarifies that procurement regulations apply to SFAs' contracting with FSMCs, not FSMCs' procurement of food or other goods on an SFA's behalf. Relator's argument that the regulations govern FSMCs' conduct, solely by virtue of their application to SAs and SFAs, lacks footing in the regulatory text, and, even if it were a plausible reading, is insufficient to establish a regulatory violation. *See Lamers*, 168 F.3d at 1018. Accordingly, since FSMCs were not clearly required to

32

abide by these regulations, Relator's allegations that Defendants' violations thereof resulted in the filing of false claims fails.[10]  *See Quinn*, 382 F.3d at 438.


**IV.     CONCLUSION**

Relator's allegations that Defendants' retention of rebates caused SAs and SFAs to file false certifications are barred by Section 3730(e)(4).  Even if jurisdiction existed over these claims, they must be dismissed because Relator cannot establish that program regulations clearly mandated FSMCs to pass through rebates to SFAs.   Likewise, Relator cannot establish that applicable regulations required FSMCs to procure goods in a manner promoting open competition, which is fatal to his FCA claim on that subject.   Accordingly, Defendants' motions are granted.[11]   An appropriate Order follows.

---

[10] Because the Court finds that Relator's claims should be dismissed, either for lack of jurisdiction or failure to state a claim, it need not address Defendants' other arguments.

[11] The Court expresses its gratitude to the parties for their thorough briefing.  These efforts and the many exhibits filed by the parties were helpful in resolving the issues raised by Defendants' motions.  Because of this thorough briefing, the Court found it unnecessary to hold oral argument.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| **ROBERT PRITSKER,** | : | |
| Relator, | : | |
| | : | |
| v. | : | |
| | : | |
| **SODEXHO, INC., et al.,** | : | **No. 03-6003** |
| Defendants. | : | |

**ORDER**

**AND NOW**, this **6**[th] day of **March, 2009**, after consideration of Defendants' motions to dismiss, Plaintiff's opposition thereto and Defendants' replies thereon and for the foregoing reasons, it is hereby ordered that:

1.  Defendants Sodexho, Inc.; Sodexho America, LLC; Sodexho Marriot Management, Inc.; and Sodexho Management Inc.'s Motion to Dismiss (Document No. 53) is **GRANTED**.

2.  Defendants Aramark Corporation and Aramark Educational Services, Inc.'s Motion to Dismiss (Document No. 55) is **GRANTED**.

3.  Defendant Compass Group USA, Inc.'s Motion to Dismiss (Document No. 57) is **GRANTED**.

4.  The Clerk of Court is directed to close this case.

BY THE COURT:

_____

**Berle M. Schiller, J.**